[No. 62938-2. En Banc.]

Argued November 20, 1997. Decided May 6, 1999.

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES BEN FINCH, *Appellant*.

[Note: Only 4 Justices concur in all of the above statements.]

*Rita J. Griffith*; and *Skellenger & Bender, P.S.*, by *Beth M. Andrus*, for appellant.

*Charles B. Finch*, pro se.

*James H. Krider, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for respondent.

MADSEN, J. — Charles Ben Finch appeals his sentence of death and his underlying convictions for the murders of Ron Modlin and Sergeant James Kinard. We uphold Mr. Finch's underlying convictions but reverse and remand his sentence of death.

## STATEMENT OF THE CASE

The Defendant, Charles Finch, married Thelma Finch in September 1993. They lived together in a mobile home owned by Thelma and her mother, Margaret Elizares. Charles and Thelma separated on July 11, 1994. When they separated, Thelma told Charles not to return and asked him for his key, which he refused. At the end of July, Thelma told Charles that Ron Modlin, a blind friend of Thelma's, was going to move into a travel trailer located on her property. Ron was a longtime friend of Thelma's who had lived on the property for many years prior to her marriage to Charles.

Around this time, Charles began asking co-workers and friends about buying a gun. Finally, a co-worker agreed to sell him a .40 caliber Ruger automatic for $350. After Thelma and Charles separated, Thelma stated that they talked only a couple of times when they would encounter each other at work. On the only two occasions they did speak, Charles asked Thelma if she had paid her burial insurance. Also, sometime in May or June, while Thelma and Charles were still married, Michael Thomas, a friend of Charles', was doing some work on the property. While inside the mobile home, Michael said that he "felt a little tension in the air" between Thelma and Charles, so he went outside. Verbatim Report of Proceedings (RP) (Jury Trial) at 1940. Later, Charles came outside and said, "I thought about buying a gun and shooting him in the head." RP (Jury Trial) at 1941. Charles did not specify who "he" was but Michael Thomas did testify that Ron was Thelma's only male friend. RP (Jury Trial) at 1941-42.

On the day of the crime, August 15, 1994, Charles asked

his boss if he could take the following two days off work. After work he went to the credit union, withdrew money, and purchased the gun.

At approximately 7:30 that evening, Charles arrived at Thelma's mobile home. Thelma, her mother, Margaret, and Ron Modlin were eating dinner in the kitchen. As Charles drove up, Thelma went onto the front porch to get the cat. Charles got out of his car carrying a 12-pack of beer. Thelma told Charles that he could not bring the beer inside, so he left it on the porch. Charles then went back and got something out of the car, proceeded back to the house and told Thelma that he had a gift for her. Charles then "passed [Thelma] real fast with the case and brushed against [her] real fast and walked in the house." RP (Jury Trial) at 212.

Upon entering, Charles yanked the phone off the wall. Ron stood up and said, "What's going on?" RP (Jury Trial) at 63. Charles said, "This," and shot him in the head, killing him. RP (Jury Trial) at 64. After he shot Ron, he stated that he had been planning that for three months. RP (Jury Trial) at 63-65.

After Charles shot Ron, Thelma grabbed his hand and they struggled. As they struggled, Charles stated that he had planned to kill Thelma for a long time. Eventually, Thelma and Charles stopped struggling. Charles told Thelma and Margaret that he would "blow them up" if they went outside or tried to help Ron. RP (Jury Trial) at 74-75. Charles repeated that he had come there to kill himself and Thelma and later stated he had also come there to kill Ron. Additionally, Charles stated that he would kill anyone who came in, including police officers. When Margaret asked why, he stated because "I don't like the lousy cops." RP (Jury Trial) at 92.

After a long period of pleading, Margaret convinced Charles to call 911. Charles called at 10:24 P.M. and reported that a man had been shot. When asked who did it, Charles said that he did. Charles further stated that he shot Ron on purpose. Charles also told the operator he would come out when the police arrived and the gun was outside. After

he got off the phone, he went to the back bedroom with his gun to wait for the police.

Among the first officers to arrive on the scene were Sgts. James Kinard and Arnold Aljets of the Snohomish County Sheriff's Office. Sgt. Kinard called to the house and asked everyone to come out. When Thelma and Margaret came out onto the porch Sgt. Kinard asked the address and at approximately that time shots rang out. Sgt. Kinard was hit in the head by one of the bullets and was killed. Thelma and Margaret left the house and hid outside. After Sgt. Kinard was shot, another officer took out the yard light to reduce visibility. When the officer shot out the yard light, Charles fired more shots from the window. At this point, the SWAT team was called in. An armored personnel carrier was used to rescue Thelma and Margaret from their hiding place by the side of the house and to position the officers closer to the house so they could shoot gas into the trailer. Although many rounds of gas were fired into the trailer, Charles did not come out of the trailer. At one point, Charles went to the front sliding glass door and shot at the armored personnel carrier.

Meanwhile, SWAT negotiators isolated the phone in the trailer, established contact with Charles and attempted to persuade him to surrender. During the conversations, Charles stated that he was going to shoot at officers he saw outside, that he had been shot in the shoulder and that he had a self-inflicted gunshot wound in his foot. At around 5:30 A.M., the negotiator, Officer Helfers, became concerned that Charles was becoming increasingly agitated and upset. Officer Helfers tried to calm the situation by suggesting that what Charles had done was not as bad as it seemed. Officer Helfers asked, "[a]re you sure it wasn't in self-defense." RP (Jury Trial) at 735. Charles answered, "[h]ell, it wasn't no self-defense. It was premeditated, man." RP (Jury Trial) at 735.

Shortly thereafter, the SWAT team entered the trailer and placed Charles under arrest. After Charles was ar-

rested and given *Miranda*[1] warnings, he made further incriminating statements to a police officer. The Defendant also made other inculpatory statements in letters and conversations with friends and co-workers.

During the investigation of the crime scene, the police tried to determine how visible Sgt. Kinard was from the bedroom window. To do this, the officers went to the scene the following evening and placed officers in the same positions as Sgts. Kinard, Aljets and Simpson were the night of the shootings. The officers recreated the same lighting as the previous evening and then videotaped what could be seen from the bedroom window.

On August 18, 1994, the Snohomish County Prosecutor's Office charged Charles Finch with the aggravated murder of Ron Modlin, the aggravated murder of Sgt. James Kinard, the second degree assault of Thelma Finch and the unlawful imprisonment of Thelma Finch and Margaret Elizares.

On November 23, 1994, the State indicated its intent to seek the death penalty by filing a Notice of Special Sentencing Proceeding. Over defense objections, the trial court ordered Mr. Finch to wear leg shackles throughout the trial and sentencing proceedings and to wear handcuffs during the testimony of Thelma Finch and Margaret Elizares. The jury found Mr. Finch guilty on all counts and sentenced him to death. Charles Finch appealed directly to this court.

## PRETRIAL ISSUES

### Notice of Special Sentencing Proceeding

When the State decides to seek the death penalty it is required to file written notice of its intent. RCW 10.95-.040(1). Written notice must be served on the defendant or counsel "within thirty days after the defendant's arraignment upon the charge of aggravated first degree murder unless the court, for good cause shown, extends or reopens

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

the period for filing and service of the notice." RCW 10.95.040(2). If the State does not file and serve notice as provided by the statute then it is precluded from seeking the death penalty. RCW 10.95.040(3).

In this case, there were two extensions for filing notice of special sentencing. Only the second extension is at issue. Mr. Finch was arraigned on August 22, 1994. On September 19, 1994, the State and the defense stipulated to an order extending the filing period to November 14, 1994. Defense counsel requested the first extension to compile mitigation evidence for the State. The court found good cause existed for the extension until November 14 and required the Defendant to provide the State with mitigation material by November 4. Mr. Finch was present in the courtroom and signed the order extending time.

On November 4, defense counsel submitted a draft mitigation statement to the prosecutor's office and on November 7, submitted the final mitigation statement. Though substantially similar, the final statement contained material not contained in the draft. On November 10, the State requested an extension based on late receipt of the mitigating information and the need to have time to consider the information.

Defense counsel agreed to the extension explaining that it would benefit both sides. Defense counsel noted that the current prosecutor had lost his election two days prior to the hearing. Thus, defense counsel wanted time for the prosecutor's office to consider the decision in light of the election. The judge granted the extension until November 23. The Defendant was present, although he did not sign the order.

The Defendant argues the second extension was improper because the State failed to make the requisite showing of good cause to justify the extension and Mr. Finch did not waive the statutory deadline.

We need not decide whether good cause existed because this procedural right was waived by defense counsel. As a general rule, a defendant's attorney may

waive a procedural (as opposed to substantive) right for tactical purposes. *Graves v. P.J. Taggares Co.*, 94 Wn.2d 298, 303, 616 P.2d 1223 (1980); *see also* 7A C.J.S. *Attorney and Client* § 208 (1980). Although we have not discussed waiver with regard to RCW 10.95.040(1) we have associated the statutory time limitation for the notice requirement with the statutory time limits for a speedy trial under CrR 3.3. *See State v. Dearbone*, 125 Wn.2d 173, 183, 883 P.2d 303 (1994); *State v. Luvene*, 127 Wn.2d 690, 718 n.7, 903 P.2d 960 (1995).

Looking to CrR 3.3, this court has held that a defendant's right to trial within 60 days is a procedural right which can be waived by defense counsel over defendant's objection, to ensure effective representation and a fair trial. *Luvene*, 127 Wn.2d at 698-99; *State v. Campbell*, 103 Wn.2d 1, 15, 691 P.2d 929 (1984); *see also State v. George*, 39 Wn. App. 145, 692 P.2d 219 (1984); *State v. Fanger*, 34 Wn. App. 635, 663 P.2d 120 (1983); *State v. Cunningham*, 18 Wn. App. 517, 569 P.2d 1211 (1977); *State v. Franulovich*, 18 Wn. App. 290, 567 P.2d 264 (1977). While recognizing the inability of counsel to waive certain fundamental guarantees, courts have explained that "[b]eing of statutory origin, a defendant's rights . . . are 'merely supplementary to and a construction of the Constitution . . . .' They do not carry the force or weight of constitutionally mandated imperatives." *George*, 39 Wn. App. at 155 (quoting *Townsend v. Superior Court*, 15 Cal. 3d 774, 781-82, 543 P.2d 619 (1975)).

■ This court has determined that the right to notice of special sentencing proceeding within 30 days of arraignment is *statutory* only. *State v. Clark*, 129 Wn.2d 805, 811, 920 P.2d 187 (1996). We explained that while the State is required to give formal notice by information to the defendant of the criminal charges to satisfy the Sixth Amendment and our state constitution, article I, section 22 (amend. 10), constitutional notice does not extend to the penalty exacted for conviction of the crime. *Clark*, 129 Wn.2d at 811. "Due process in sentencing requires only adequate notice of the

possibility of the death penalty." *Id.* Thus, like CrR 3.3, the time limitation for the notice of special sentencing provided in RCW 10.95.040 is a procedural right which may be waived by defense counsel for tactical reasons.

Defendant next argues that while courts have allowed defense counsel to waive the speedy trial time limitations in CrR 3.3, the courts have always considered the reasons for the waiver. In the speedy trial context, courts have recognized that "[c]ounsel's power in this regard is not unlimited . . . . Nor may counsel effectively waive his client's rights where the record reveals that the latter was the victim of inadequate representation." *George*, 39 Wn. App. at 155. Here, the Defendant makes no allegation of ineffective representation by counsel. Moreover, defense counsel believed the election of a new prosecutor could have an impact on the State's decision to seek the death penalty against Mr. Finch. Defense counsel moved to recuse the Snohomish County Prosecutor's Office because of allegedly biased comments made by former prosecuting attorney, Seth Dawson, to the local press. It follows that defense counsel believed a change in prosecuting attorney could have a beneficial impact in his client's case.

Finally, the Defendant argues that even if his counsel can waive this procedural right he must still understand the right being waived. Contrary to arguments by the Defendant, this court, with regard to CrR 3.3, has never required the "understanding" of the defendant before counsel could waive his statutory right to a trial within 60 days. *See Luvene*, 127 Wn.2d at 698-99; *Campbell*, 103 Wn.2d at 15. If a defendant's consent is not required to waive a procedural right then it is illogical to conclude that the defendant must nevertheless understand fully the right being waived. *Accord* 7A C.J.S. *Attorney and Client* § 208 (a defendant may be bound to his lawyer's decision on procedural matters affecting his legal rights even if he does not fully know and understand those rights). Thus, we find the trial court did not err in extending the time period for filing notice of special sentencing proceeding because defense counsel waived this procedural right.

Motion to Recuse Prosecuting Attorney's Office

The Defendant argues that the trial judge erred in denying his motion to recuse the Snohomish County Prosecutor's Office. This motion was primarily based on a statement made by Seth Dawson, prosecuting attorney at the time of the incident, that appeared in the EVERETT HERALD. Seth Dawson stated that Sgt. Kinard "was respected by every member of our department and people are taking this as hard as the people in the sheriff's office." Clerk's Papers (CP) at 2005. The Defendant argues that the prosecutor's office violated the appearance of fairness doctrine.

The appearance of fairness doctrine, however, only applies to *judicial and quasi-judicial decision makers*. The doctrine seeks to prevent "the evil of a biased or potentially interested judge or quasi-judicial decisionmaker." *State v. Post*, 118 Wn.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992). This doctrine not only requires the judge to be impartial but " 'it also requires that the judge appear to be impartial.' " *Id.* at 618 (quoting *State v. Madry*, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972)). The Defendant asserts that the doctrine applies to prosecutors, based on a line of cases out of the Washington Courts of Appeals. *See State v. Perez*, 77 Wn. App. 372, 891 P.2d 42 (1995); *State v. Ladenburg*, 67 Wn. App. 749, 840 P.2d 228 (1992). The Courts of Appeals have applied the appearance of fairness doctrine to prosecutors to the extent that they act in a quasi-judicial capacity in determining what charges to file and whether or not to plea bargain. *See Perez*, 77 Wn. App. at 376; *Ladenburg*, 67 Wn. App. at 754.

This court, in *Carrick v. Locke*, 125 Wn.2d 129, 143 n.8, 882 P.2d 173 (1994), however, found that the appearance of fairness doctrine did not apply to the prosecutor in that case. In *Carrick*, the court found the separation of powers doctrine was not violated where the coroner's statute and executive order permitted a district court judge to preside over an inquest for any death for which a King County law enforcement agent may be responsible. *Id.* at 140-43. In

this context, the court rejected an appearance of fairness challenge to the prosecutor's participation in the inquest, finding that the " 'appearance of fairness doctrine is directed at the . . . potentially interested judge or quasi-judicial decisionmaker.' " *Id.* at 143 n.8 (quoting *Post*, 118 Wn.2d at 618-19). The court explained that "[t]he prosecutor is not the decision maker at the inquest, so there can be no appearance of fairness challenge to his or her involvement." *Id.*

The Defendant attempts to distinguish *Carrick*, arguing that it is limited to the facts of the case, and that the doctrine applies to a prosecutor's decision to bringing charges, including whether to seek the death penalty. Our decision in *Carrick*, however, was not so limited.

Whether a decision is quasi-judicial in nature depends on whether the decision was adjudicatory in nature. *See Harris v. Hornbaker*, 98 Wn.2d 650, 659-60, 658 P.2d 1219 (1983) (the Legislature's determination of where to place a road was a distinctly *legislative* decision and therefore the appearance of fairness doctrine did not apply). The State correctly argues that the prosecutor's decision whether to file charges or to plea bargain is an executive, not adjudicatory, decision. This court has never recognized a prosecutor's discretion to file charges or to seek the death penalty as a judicial function. *See Campbell*, 103 Wn.2d at 26; *State v. Dictado*, 102 Wn.2d 277, 298-99, 687 P.2d 172 (1984). A prosecutor need not hold a public hearing before deciding whether to file charges;[2] "[t]he decision to prosecute [is] based on the prosecutor's ability to meet the proof required by the statute." *State v. Lee*, 87 Wn.2d 932, 934, 558 P.2d 236 (1976). Additionally, this court has emphasized that when making the determination to seek the death penalty "[t]he prosecutor does not determine the sentence; the prosecutor merely determines whether sufficient evidence exists to take the issue of mitigation to the jury." *Dictado*,

---

[2]*See Zehring v. City of Bellevue*, 103 Wn.2d 588, 591, 694 P.2d 638 (1985) (the appearance of fairness doctrine has never been applied to an administrative action except where a hearing was required by statute); *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 67-68, 578 P.2d 1309 (1978) (same).

102 Wn.2d at 297-98. The jury or the judge makes the determination of guilt and the appropriate sentence, not the prosecutor.

Moreover, the Supreme Court has held that "rigid requirements . . . designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). The Court observed that, unlike judges, "[p]rosecutors need not be entirely 'neutral and detached,' " and may be rewarded for initiating and carrying out prosecutions in the name of the people. *Id.* at 248. As such, they "are necessarily permitted to be zealous in their enforcement of the law." *Id.* Although the constitution prevents prosecutors from making decisions that are "motivated by improper factors or . . . contrary to law. . . . [T]he strict requirements of neutrality cannot be the same for . . . prosecutors as for judges . . . ." *Id.* at 249-50.

The evils the appearance of fairness doctrine seek to prevent are not implicated in this case because a prosecutor is not a quasi-judicial decision maker. A prosecutor's determination to file charges, to seek the death penalty or to plea bargain are executive, not adjudicatory, in nature and therefore the doctrine does not apply.

## GUILT PHASE ISSUES

### Evidentiary Issues

This court reviews a trial court's decision to admit evidence under an abuse of discretion standard. *E.g., State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997); *State v. Pirtle*, 127 Wn.2d 628, 648, 904 P.2d 245 (1995); *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995); *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). When a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists. *Stenson*, 132 Wn.2d at 701.

a. Admissibility of "in-life" photographs with dogs

The Defendant objects to the trial court's ruling allowing the State to introduce "in-life" photos of Ron Modlin and Sgt. Kinard with their dogs. The picture of Ron Modlin depicted him with his Seeing Eye dog and the picture of Sgt. Kinard presented him, in uniform, with his police dog.

██ ██ The admission of in-life photographs lies within the discretion of the trial court. Such photographs have been held relevant to establish the identity of the victim. *Pirtle*, 127 Wn.2d at 651-53; *State v. Rice*, 110 Wn.2d 577, 598-99, 757 P.2d 889 (1988). The State need not accept a stipulation as to identity and may insist on proving the issue in the manner it wishes. *Pirtle*, 127 Wn.2d at 652; *Rice*, 110 Wn.2d at 599; *State v. Brett*, 126 Wn.2d 136, 159-60, 892 P.2d 29 (1995). Once the court has determined that such evidence is relevant, then the court must determine whether its probative value is substantially outweighed by unfair prejudice to the defendant. *Pirtle*, 127 Wn.2d at 651-53; *Rice*, 110 Wn.2d at 598-99; *see also State v. Furman*, 122 Wn.2d 440, 452, 858 P.2d 1092 (1993) (" 'In life' pictures are not inherently prejudicial, particularly where . . . the jury has seen 'after death' pictures of the victim's body.").

██ In this case, the court found the photos relevant to the question of identification. The Defendant, however, argues that the presence of the dogs did not serve the purpose of identifying the victims and unnecessarily increased the potential to inflame the jury because they suggest the dogs had lost their owners and were victims too. Only one jurisdiction has dealt squarely with this issue. In *State v. Hagen*, 181 Wis. 2d 934, 512 N.W.2d 180 (1994), the Wisconsin Court of Appeals found no abuse of discretion where a picture of the victim with his dog was admitted, despite the defendant's contention that the State's sole purpose was to evoke sympathy from the jury.

Referring to the presence of the dogs, the trial court in this case found that the photos were just a fraction of large numbers of exhibits to be admitted at trial and that "the

acts and the incidents involved here are serious enough to overshadow any influence [that] the dog in a picture might have . . . ." RP (Pretrial) at 1422. Additionally, since Modlin was blind and Sgt. Kinard was a K-9 officer, the presence of the dogs was a part of their identification. Thus, we find that the trial court did not abuse its discretion in admitting the "in-life" photographs with the dogs into evidence.

b. Admissibility of autopsy photograph

The Defendant argues that the trial court erred in admitting into evidence an autopsy photograph of Sgt. Kinard because the photograph was inflammatory and unduly prejudicial. The photograph presents Sgt. Kinard's head with his skin peeled back and the top portion of his cranium removed. The picture shows a probe through the entrance and exit wounds to demonstrate the path of the bullet through his skull.

The Defendant argues the photo was of only marginal relevance as it was undisputed at trial that Mr. Finch fired the shot from the bedroom window to the area where Sgt. Kinard stood. Additionally, the medical examiner could have adequately shown the jury the path of the bullet with a diagram or sketch. The effect of the photograph, argues the Defendant, was to evoke an unfairly prejudicial response from the jurors.

The decision of whether to admit photographs lies within the sound discretion of the trial court. *State v. Lord*, 117 Wn.2d 829, 870, 822 P.2d 177 (1991). This court has explained that gruesome photographs are admissible if the trial court finds their probative value outweighs their prejudicial effect. *Id.* at 871. In particular, autopsy photographs have probative value where they are used to illustrate or explain the testimony of the pathologist who performed the autopsy. *Id.*

In *Gentry*, this court upheld the admission of photographs that showed the head injuries of the victim. *State v. Gentry*, 125 Wn.2d 570, 607-09, 888 P.2d 1105 (1995). In one of the pictures, the skin was peeled back to show the skull

fractures. Despite their gruesome nature, the court found the photographs relevant to show the extent of the victim's injuries which were relevant to the contested issues of intent to kill and premeditation. *Id.* at 608-09. The court rejected the defendant's argument that a diagram should have been used instead of the photographs. *Id.*

In this case, the trial court found that not only did the photograph show the mechanism of death, but that it showed the trajectory of the bullet as well. By helping to establish the bullet's trajectory, the photograph could assist in establishing Sgt. Kinard's relative position in relation to the house and what direction he was looking at the time he was shot. In this case, a contested fact was whether Mr. Finch could see Sgt. Kinard. This disputed fact was relevant to the issues of intent and premeditation. Thus, the trial court did not abuse its discretion in admitting the autopsy photograph.

c. Admissibility of video and officer testimony

On the evening of August 16, 1994, officers went to the scene of the crime to video what could be seen from inside the residence under the same conditions as existed the night of the incident. In order to create similar lighting conditions, the yard light,[3] which was shot out the night before, was replaced. Additionally, the lights in the southern portion of the trailer were on and the porch light was on. These conditions were consistent with the lighting conditions that existed the night of the crime.

The officers also had information that Sgt. Kinard left the rear flashers of his patrol vehicle on, which illuminate the back portion of the vehicle. However, Sgt. Aljets, who helped recreate the scene, did not recall those lights being on. Because Sgt. Aljets wanted to be consistent with his testimony and to err on the side of less light, a similarly lighted vehicle was used during the video.

Sgt. Aljets was standing next to Sgt. Kinard when Ki-

---

[3]The "yard light" is virtually identical to a typical streetlight except for its location. The yard light was approximately 23 feet above ground.

nard was shot, and, therefore, he was chosen to position the officers. Two different officers of similar size and attire stood in for Sgts. Kinard and Simpson. Sgt. Aljets placed himself and the two other officers approximately 100 feet from the trailer next to two utility poles, relying on a bloodstain on the ground directly in front of the officer he had placed in Sgt. Kinard's position.[4]

The officers captured three different vantage points in the video.[5] First, officers took footage from the master bedroom window of the trailer because from that area the police had sufficient evidence indicating that Mr. Finch had fired the shots which killed Sgt. Kinard. The officers located by the utility poles were instructed to conduct themselves in a manner similar to the night before, moving as needed to see what was going on at the trailer.

Although the nighttime video showed some of the foliage in the vicinity of the officers, it did not show any images or movement from the officers by the utility poles. Detective Slack, who was present in the bedroom of the mobile home while Detective Freisen was videotaping, testified that he could see the officers moving behind the rhododendron by the utility poles. Detective Slack stated that he could see a luminescent object moving in that area, through a "tunnel" in a large rhododendron. Detective Freisen also looked out the window without the video camera and testified that he could also see a "light-colored object" moving behind the rhododendron.

When the officers realized the video camera was not picking up these images they moved out of the residence to the roadway, about 50 feet from the officers. Filming from that vantage point the camera did show an officer bent over and luminescent objects moving. The following day, the officers decided to take a daytime shot from the bedroom window with the officers placed in the same loca-

[4]The yard light was approximately halfway in between the telephone poles and the trailer.

[5]The entire video is approximately six minutes in length.

tion. This part of the video clearly shows the foliage in the area and also shows the movement of the officers behind the bushes. Defense counsel did not object to the daytime portion of the video; thus, arguments made by the Defendant regarding its admissibility were not properly preserved for appeal.

Defense counsel did, however, object to showing the jury the audio and video portions of the video conducted at night and to the officers' supplemental testimony. The court sustained defense counsel's objection to the audio portion of the tape[6] but allowed the jury to see the video portion of the tape. Additionally, the trial court allowed the officers' testimony. The trial court reasoned that the nighttime portion of the video took place under substantially similar conditions as those of the night in question.

The trial judge found the officers' testimony would assist the jury. He found no unfair prejudice to the Defendant noting that any differences existing between the night of the video and the night of the crime could be adequately handled through cross-examination and would go to the weight of the evidence.

Turning to the video, the trial judge recognized that its probative value was diminished because what the officers purport to have seen during the taping is not apparent on the video. However, he found the video still had probative value as it depicted much of what could be seen from the window demonstrating the nature of the investigation. Additionally, the trial judge was concerned that if the officers testified about conducting this video experiment but failed to show the videotape it would seem suspicious. The judge found no prejudice to the Defendant and noted that the video could be advantageous to the defense, since it did not show what the officers claimed to have seen.

On appeal, the Defendant claims the trial court erred in admitting the videotape and the testimony of the officers

---

[6]During the videotaping, Sgt. Aljets repeated the voice commands made by Sgt. Kinard the previous night.

because the State failed to demonstrate the conditions were the same as the night of the crime.

■ ■ The use of demonstrative evidence is encouraged when it accurately illustrates facts sought to be proved. *Jenkins v. Snohomish County Pub. Util. Dist. No.1*, 105 Wn.2d 99, 107, 713 P.2d 79 (1986). Demonstrative evidence is admissible if the experiment was conducted under substantially similar conditions as the event at issue. *Jenkins*, 105 Wn.2d at 107. Determining whether the similarity is sufficient is within the trial court's discretion and the decision will not be disturbed on appeal absent an abuse of discretion. *Id.*; *see also DiPangrazio v. Salamonsen*, 64 Wn.2d 720, 727, 393 P.2d 936 (1964); *State v. Stockmyer*, 83 Wn. App. 77, 85, 920 P.2d 1201 (1996). If the similarity is sufficient to justify admission, any lack of similarity goes to the weight of the evidence. *Id.*; *see also State v. Rogers*, 70 Wn. App. 626, 633, 855 P.2d 294 (1993); *Kramer v. J.I. Case Mfg. Co.*, 62 Wn. App. 544, 555, 815 P.2d 798 (1991); *Jones v. Halverson-Berg*, 69 Wn. App. 117, 126, 847 P.2d 945 (1993).

Additionally, the evidence sought to be admitted must be relevant. " 'The ultimate test for the admissibility of an experiment as evidence is whether it tends to enlighten the jury and to enable them more intelligently to consider the issues presented.' " *Jenkins*, 105 Wn.2d at 107 (quoting *Sewell v. MacRae*, 52 Wn.2d 103, 107, 323 P.2d 236 (1958)). If the evidence is more prejudicial than probative then the court should refuse its admission. *Id.*

Contrary to the Defendant's arguments, videos admitted into evidence for demonstrative purposes need not exactly portray the event in question. In *Jenkins*, David and Barbara Jenkins brought suit on behalf of their seven-year-old son, Jonathan, and themselves for injuries suffered by Jonathan when he climbed the fence of a Snohomish County Public Utility District (PUD). *Jenkins*, 105 Wn.2d at 100. The trial court allowed the admission of a video recording of a boy about Jonathan's age and size climbing over the gate Jonathan climbed over and it also showed the

boy climbing over other portions of the fence. *Id.* at 107. Although the court noted that the video was not an exact representation of the events as they occurred, it found no abuse of discretion in admitting the tape. The court emphasized that the conditions were similar to the event in question and any differences were explained to the jury. *Id.* at 108. *See also Jones,* 69 Wn. App. at 126-27 (the admission of a video taken 10 years after the event in question was not an abuse of discretion because any differences were brought out in testimony and cross-examination); *Kramer,* 62 Wn. App. at 554-55 (a videotape prepared to support the contention that a properly operated backhoe could not have gone out of control and slid or rolled down the street was properly admitted where witness testified the slope on the day of the demonstration was more slippery than it was on the day of the accident).

The Defendant, however, relies on the Washington Court of Appeals' decision in *Stockmyer* where the court upheld the trial court's ruling to exclude a video reenactment of the crime in question. *Stockmyer,* 83 Wn. App. at 82-85. In *Stockmyer,* several different individuals attempted to portray the actual assault on George Benson and the killing of Carl Heagle. *Id.* at 82. In affirming, the appellate court noted the particular dangers associated with videotaped crime reenactments. *Id.* at 84. The court agreed there were justifiable concerns about the factual inaccuracies of the video and its potential prejudicial effects. *Id.* at 85.

Contrary to arguments by the Defendant, the video in this case was not a reenactment. The prosecution used the tape only to show what could be seen from the bedroom window under similar circumstances.

The Defendant next argues that the trial court erred in its ruling that the conditions on the night of the video were substantially similar to the night of the crime. In particular, the Defendant argues that the lighting conditions were not substantially similar noting that a police car was not placed in a similar position as Sgt. Kinard's car with its

rear flashers on. However, Sgt. Aljets testified that the lighting conditions were "pretty much the same" as the night before and that he did not recall those lights being on. RP (Jury Trial) at 487. Additionally, the car was a substantial distance (four hundred feet) from where Sgt. Kinard was located and the lights were not projecting directly toward that area.[7] Thus, the lights on the patrol car, on or off, had little impact on the lighting in the area. Moreover, shooting the video in less light would clearly not prejudice the defense.

The Defendant also argues that the officer standing in for Sgt. Kinard was not the same height, was not wearing a baseball cap, and was wearing different clothing. However, the testimony of the officers indicates that the person standing in for Sgt. Kinard was about the same height as Sgt. Kinard and, although the actual clothing was not the same, it was similar in color. The individual standing in for Sgt. Kinard was not wearing a baseball cap but this difference is not significant enough to preclude the admission of the video or the oral testimony as to what the officers could see that evening. The officers were not only concerned with whether Sgt. Kinard was visible but whether any of the officers in the location could be seen from the bedroom window.

We find that the conditions during the videotaping were substantially similar to those on the night in question and any differences were brought out in testimony and cross-examination. What could be seen from the bedroom window was relevant to questions of intent and premeditation, and therefore the officers' testimony and the video had probative value. The probative value of this evidence was not outweighed by prejudice to the Defendant, especially with regard to the video, which tended to show that the officers were not visible. Thus, we find that the trial court properly

---

[7]The car was situated perpendicular to the scene so that standing in Sgt. Kinard's location one would see the left side of the car.

admitted the nighttime video and officer testimony.[8]

d. Admissibility of the officers' reactions to the death of Sgt. Kinard

Defense counsel submitted a motion in limine objecting to testimony by officers concerning their emotional reaction to Sgt. Kinard's death. During argument on the motion, the court asked defense counsel to define more clearly what type of statements he was objecting to. Counsel indicated that he was concerned with reflective thoughts such as how the impact of Sgt. Kinard's death had affected the other officers' lives. The court then asked if defense counsel was attempting to restrict the testimony regarding their state of mind or emotions as the events unfolded. Defense counsel stated that generally he was not, but he expressed concern that the testimony could "get out of hand." RP (Pretrial) at 1398.

The trial judge granted the defense motion, stating he would allow only testimony relevant to the witnesses' state of mind or ability to perceive events which took place at the time and, perhaps, to explain their actions. He agreed with defense counsel that such testimony could go too far and stated that objections would have to be made in the course of examination. RP (Pretrial) at 1399.

On appeal, the Defendant objects to testimony regarding the officers' reaction to Sgt. Kinard's death which was admitted at trial. Defense counsel, however, with one exception, made no objection to the testimony it now argues was erroneously admitted. Without such objection, an evidentiary error is not preserved for appeal. *State v. Powell*, 126 Wn.2d 244, 256, 893 P.2d 615 (1995).

 ██ Defendant, however, argues that the motion in limine preserved the issue. When an evidentiary ruling is pursuant to a motion in limine, only *the losing party* is

---

[8]The Defendant also argues that the video should not have been admitted because it was inadmissible hearsay. Defense counsel never objected to the admission of the video on hearsay grounds, therefore, this issue was not properly preserved for appeal.

deemed to have a standing objection and need not specifically object at trial to preserve the issue for appeal. *Id.* In this case, the Defendant's motion in limine was granted. Additionally, a party's objections to evidence made in their motion in limine are not preserved for appeal if the " 'trial court indicates that further objections at trial are required when making its ruling.' " *Id.* (quoting *State v. Koloske*, 100 Wn.2d 889, 895, 676 P.2d 456 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988)). The trial court specifically stated that any further objections with regard to this issue were to be made during the trial. Thus, those allegedly emotional statements which were not objected to at trial by defense counsel were not properly preserved for appeal and will not be reviewed by this court.

The one objection made at trial concerned Detective Pince's interview of Mr. Finch. The testimony was as follows:

Q: Detective Pince, did you know Sergeant Kinard?

A: Yes, I did.

Q: How well did you know him?

A: I've known him—known him the whole time he's worked here.

Q: Did you have any feelings about interviewing the person that you knew had been accused of killing Sergeant Kinard?

A: I knew that it was going to be a difficult interview.

. . . .

Q: Detective Pince, what mental preparation did you make in order to do this interview?

A: During the brief ride up the elevator, I was attempting to remove all of the emotional feelings that I had about the victims in this case and I wanted to prepare myself to do a nice, clean interview with Mr. Finch.

RP (Jury Trial) at 1017, 1020.

Defense counsel objected to this line of questioning argu-

ing that the emotions of Detective Pince were not relevant to the statements made by Mr. Finch during questioning. The trial court allowed the testimony explaining that, in prior testimony, there had been an insinuation that Mr. Finch had been mistreated. The court was therefore concerned with the possible inference which could be drawn from the previous testimony and from the fact that this was an in-house investigation.

Based on these facts, we find that the trial court did not abuse its discretion. Detective Pince's testimony was relevant to describe his actions on that evening and to dispel possible inferences of unfair treatment.

e. Admissibility of a letter written by Mr. Finch

The Defendant argues error in the admission of a portion of a letter he wrote to a friend while he was in jail. The significant paragraph, with the sentences objected to by defense counsel underlined, reads as follows:

> Chip has probably told you all the things [Thelma] has done to me. I'm glad that she is out of my life now. I'm just sorry that it had to come to this. As you know, I will probably be in a place like this for the rest of my life. I am just sorry that my story won't ever be told. No one wants my side out. Just that there was some lousy cop killed, and idiot blind person. Nothing about the person that asked her husband to do the killing, promising to stand by him and do whatever it takes to get through this. As soon as I am caught, she is telling lies, and doing things to cause trouble.

RP (Jury Trial) at 1990.

The Defendant argues the trial court erred in not redacting the two underlined sentences from the letter, asserting they had little or no probative value and tremendous prejudicial impact. The Defendant contends that the irreverent reference to the two men likely stirred the passions and prejudices of the jury.

The State contends that omitting them would distort the meaning of the paragraph which is probative because it could tend to show, if believed, that killing Ron was planned

at Thelma's request. Additionally, the State argues that the challenged sentences are relevant to show the Defendant's motive because they show hostility toward the victims.

We turn first to the State's argument that the statements indicated hostility toward the victims of the crime and, thus, were relevant. Both prior and subsequent hostile acts or declarations have been found admissible, to issues of motive, malice, deliberation and state of mind, where relevant to such conditions as of the time of the offense. *See, e.g., People v. Harris*, 47 Cal. 3d 1047, 767 P.2d 619, 255 Cal. Rptr. 352 (1989) (defendant's statements during a confession that he hated white people were relevant because they revealed a motive for the killing); *Hutchinson v. State*, 477 N.E.2d 850 (Ind. 1985) (letters written by the defendant were relevant to the issue of intent); *Commonwealth v. Kaster*, 300 Pa. Super. 174, 446 A.2d 286 (1982) (letter written after commission of crime was relevant as evidence of malice); *Bankhead v. State*, 33 Ala. App. 269, 32 So. 2d 814 (1947) (declaration after commission of crime could be taken to antedate the time of the shooting and for this reason was admissible); *Henley v. State*, 31 Ala. App. 433, 18 So. 2d 98 (1944) (subsequent statements of defendant may be admissible to show defendant's hostility during the killing); *see also* 41 C.J.S. *Homicide* § 209, at 50 (1991); 2 JOHN HENRY WIGMORE, EVIDENCE § 395, at 348 (3d ed. 1940).

A defendant's hostility toward his victims, even though expressed prior to or subsequent to the crime, may be admitted to show that the hostility existed at the time of the crime. *Henley*, 31 Ala. App. at 434. If the earlier or later emotions are not relevant as evidence of its existence at the time at issue, then the evidence should be excluded. *White v. Commonwealth*, 360 S.W.2d 198, 202 (Ky. Ct. App. 1962). The potential for error is that the prior emotion may have been brought to an end before the time at issue, and the subsequent one may have been first produced since that time. *Id*; WIGMORE, *supra*, § 395, at 348; *see also Karsner v. Commonwealth*, 235 Ky. 710, 32 S.W.2d 43 (1930)

(admission of a statement by defendant indicating callosity of heart and bearing on question of malice held inadmissible where the statement was made six months after the commission of the crime).

In *Kaster*, the trial court admitted a letter written by the defendant to his friend six weeks after the chief of police was shot. *Kaster*, 300 Pa. Super. at 177. Enclosed with the letter was a drawing, depicting another police officer chained and hanging by a noose in front of a burning house with his nickname "Nipper of Corse [sic]" written at the top. *Id.* at 177. The appellate court upheld the admission of the letter as evidence of malice and ill will toward the police and to corroborate testimony that there was evidence of a plan to kill several police officers. *Id.* The court stated that "evidence of a defendant's actions both before and after a crime may be admissible to show motive and malice." *Id.* at 178.

In a similar case, the Supreme Court of Indiana found no abuse of discretion in admitting a letter written by the defendant postdating the crime. *Hutchinson*, 477 N.E.2d at 853-54. The defendant appealed his conviction of attempted murder assigning error to the admission of letters, arguing they were unduly prejudicial. *Id.* at 853. A contested portion of one of the letters reads as follows:

> I knew these cops were fucking with my mail again. I knew that I should have received a letter from you. The rotten bastards think they're slick. I wish I had a gun in my hand. I'd make the fucking pigs do the funky chicken. I'd pull a Humphrey Bogart on them. 'Come and get me, Copper. You'll never take me alive. The only thing coming out of my cell is a stream of lead.' Smile. I wish I had just one more chance at the punk who shot me. The dirty, Jew bastard.

*Id.* at 853.

The court found the edited letters relevant to the issue of intent but did recognize the obvious prejudicial nature of the letters. Since the court found the scales of justice were near equipoise it deferred to the trial court's ruling. *Id.* at 854.

In this case, the statements by the Defendant indicate his hostility toward the victims and have probative value to issues of motive and intent. Also, the creation of the letter was not so far removed in time from the crime to render it irrelevant. The challenged sentences also have some probative value because they provide a context for the statement by the Defendant that Thelma asked him to kill Ron. The obvious prejudice of these statements is that it presents the Defendant as a callous human being. As in *Hutchinson*, the question is close and, thus, we will defer to the trial court's ruling.

f. Admissibility of testimony by the Defendant's friend

■ During the State's case in chief, Darald Wendlin, a friend and co-worker of the Defendant, testified that Mr. Finch stated he deliberately shot the police officer. The Defendant sought to rebut this evidence with testimony of Linda Hein, who would testify that, in a separate conversation, Mr. Finch told her that he did not intend to kill the officer. The trial court excluded Ms. Hein's testimony as self-serving hearsay and the Defendant claims error.

Courts have repeatedly recognized:

> Out-of-court admissions by a party, although hearsay, may be admissible against the party if they are relevant. However, if an out-of-court admission by a party is self-serving, and in the sense that it tends to aid his case, and is offered for the truth of the matter asserted, then such statement is not admissible under the admission exception to the hearsay rule.

*State v. Haga*, 8 Wn. App. 481, 495, 507 P.2d 159 (1973) (citation omitted); *State v. Fullen*, 7 Wn. App. 369, 381, 499 P.2d 893 (1972); *State v. Huff*, 3 Wn. App. 632, 636, 477 P.2d 22 (1970); *see also State v. King*, 71 Wn.2d 573, 577, 429 P.2d 914 (1967); *State v. Johnson*, 60 Wn.2d 21, 31, 371 P.2d 611 (1962).

In *State v. Johnson*, the trial court excluded a written denial of improper relations with the prosecution's witness. *Id.* at 30-31. The statement was made to a police officer seven days before his written confession. *Id.* at 30. This

court upheld the exclusion, finding that it was self-serving hearsay.

The problem with allowing such testimony is that it places the defendant's version of the facts before the jury without subjecting the defendant to cross-examination. *State v. Bennett*, 20 Wn. App. 783, 787, 582 P.2d 569 (1978). This deprives the State of the benefit of testing the credibility of the statements and also denies the jury an objective basis for weighing the probative value of the evidence. *Id.*

■ The Defendant argues, however, that the exclusion denied him his right to compulsory process. A defendant's right to admit evidence pursuant to his right to compulsory process is subject to established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). In this case, the right to compulsory process does not allow the defendant to escape cross-examination by telling his story out-of-court. Thus, the trial court did not abuse its discretion in excluding Linda Hein's testimony.

Failure to give Mr. Finch *Miranda* warnings during negotiations with SWAT team negotiators.

Mr. Finch argues that the trial court erred in denying his motion to suppress incriminating statements he made to a SWAT team negotiator. At around 2:45 A.M. the morning of the incident, SWAT team negotiators contacted Mr. Finch and negotiators isolated the phone in the house so that he could not make, or receive, any outside calls.

The first negotiator, Sgt. Gray, had little success calming Mr. Finch. All conversations were extremely terse and ended with Mr. Finch hanging up the phone. Mr. Finch did repeatedly request to be connected to his sister in California and the police negotiator told him they would try to get her on the line. Shortly after 3 A.M., Mr. Finch told the negotiator he had shot himself in the foot and, soon thereafter, he threatened to shoot at another officer stating that he could see a "guy by the tree" and that he was "fixing to fire at him." RP (Jury Trial) at 714.

Negotiations were turned over to Officer Helfers at about 4:20 A.M. While talking with Officer Helfers, Mr. Finch repeatedly stated that he was shot in the shoulder. Officers who were attempting to initiate a three-way line with Mr. Finch's sister informed Officer Helfers that establishing the line was not possible with the equipment they were using. Officer Helfers told Mr. Finch they were having difficulty establishing a line which upset Mr. Finch further. Finally, Mr. Finch indicated a willingness to have a conversation with Officer Helfers. During this conversation, Mr. Finch made incriminating statements. At no time during the negotiation was Mr. Finch given *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966). Officer Helfers recounted this conversation in his testimony at trial:

A: I asked him if he wanted to talk to his sister, to which he replied "I want to talk to anybody now." . . . So I responded "You can talk to me."

. . . .

Q: What happened after you said that "You can talk to me"?

A: Charlie stated "I had an argument and a fight with another male." . . . I asked Charlie what the male's name was and he stated Ron something. He then went on to state that he had shot Ron.

Q: How would you describe Charlie's . . . emotional state at this time?

A: It sounded like he was becoming agitated and upset on the phone at me . . .

Q: How did you respond?

A: I asked about the situation in a manner that I asked—I asked "Well it sounds like you had a disagreement. Are you sure you didn't shoot Ron in self-defense?"

Q: What were you trying to do by framing a question like that?

A: I was trying to plant a seed in Charlie's mind that maybe

what he had done isn't as bad as it seemed. I was trying to offer him some hope in the light that he wouldn't take his life or somebody else's life.

Q: Despite everything that had gone on during that night, were you still trying to talk Charlie out of the residence—

A: Oh, yes

Q: —without harm to either him or anyone else?

A: Very much so.

Q: After you said, "It sounds like had you [sic] a disagreement" and mentioned "self-defense," did Charlie respond?

A: Looking at my notes, Charlie replied, "Hell, it wasn't no self-defense. It was premeditated, man. I shot him."

Q: Did you respond to that?

A: I again tried to downplay the situation by asking "Are you sure it wasn't self-defense? There's a lot of arguments that could be made against that."

. . . .

To which Charlie again stated "No, it was premeditated. I went in and shot him."

Q: Did Charlie go on to tell you any other information after the premeditated statement?

A: He stated that he initially went back to the house because he was going to shoot his wife and then commit suicide.

RP (Jury Trial) at 733-36. During this conversation with the Defendant, the SWAT team entered the room and placed Mr. Finch under arrest.

The Defendant argues that the incriminating statements should have been suppressed for lack of *Miranda* warnings. Prior to a custodial interrogation by the police, a defendant must be given *Miranda* warnings[9] to protect the defendant's Fifth Amendment privilege against self-incrimination.

---

[9]*Miranda* requires that the suspect:

The Court reasoned that the interaction of custody and official interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. If police conduct a custodial interrogation without *Miranda* warnings then statements made by the defendant during the interrogation may not be introduced in a trial against him. *Id.* at 479. Mr. Finch argues he was both in custody and being interrogated.

We need not determine whether Mr. Finch was being interrogated while in custody because this case clearly falls within the public safety exception to the *Miranda* requirement. In *New York v. Quarles*, 467 U.S. 649, 656, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984), the Supreme Court, in response to concerns for police and public safety, created a "public safety exception" to the *Miranda* requirement.

In *Quarles*, the Court concluded "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. There, the defendant was arrested in a supermarket and police believed that just before the arrest the defendant had discarded a loaded firearm inside the supermarket in a place where a third party could gain access. Without first administering *Miranda* warnings, police questioned the defendant about the location of the gun and the defendant responded with an inculpatory statement. Based on public safety concerns, the Supreme Court concluded that the statement need not be suppressed. Recognizing that handling emergencies requires

---

be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479.

split-second decisions, the Supreme Court

> decline[d] to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to . . . neutralize the volatile situation confronting them.

*Id.* at 657-58. The Supreme Court has noted that the public safety exception created by the Court in *Quarles* reflects the reality that the Constitution "is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963).

To determine whether the public safety exception applies, the Court asks whether there was "an objectively reasonable need to protect the police or the public from any immediate danger . . . ." *Quarles*, 467 U.S. at 659 n.8. Other jurisdictions have applied the public safety exception in circumstances similar to this case. For example, in *People v. Manzella*, 150 Misc. 2d 956, 571 N.Y.S.2d 875 (1991), the defendant sought to suppress statements made to a police negotiator while armed and barricaded in his home. *Id.* at 957. The defendant, Manzella, had shot two officers who were walking up his driveway to serve an arrest warrant. *Id.* The court found that an emergency existed creating a substantial danger to the lives of the police officers and to the suicidal defendant. Relying on *Quarles* the court found that *Miranda* warnings were not required. *Id.* at 962; *see also People v. Mayfield*, 14 Cal. 4th 668, 733, 928 P.2d 485 (1997); *People v. Treier*, 165 Misc. 2d 665, 670-71, 630 N.Y.S.2d 224 (1995); *Howard v. Garvin*, 844 F. Supp. 173, 175 (S.D.N.Y. 1994).

Requiring the *Miranda* warnings in the present case could have further upset Mr. Finch and eroded the potential for a peaceful resolution. The *Miranda* warnings are intended to "warn" a suspect that the police have interests that are antagonistic to his, and that his statements can be used against him in court. This type of warning would

erode the atmosphere of trust necessary to convince Mr. Finch to surrender peacefully. *See Manzella*, 150 Misc. 2d at 962 (giving *Miranda* warnings "would have only provided Defendant with reason to discontinue communication, thereby destroying the one thing that was at least maintaining the status quo and that was probably preventing a more violent confrontation").

In this case, the Defendant shot and killed two people, one of whom was a police officer, without provocation. Mr. Finch barricaded himself in the trailer and indicated an intent to shoot other police officers. After Sgt. Kinard was shot, two or maybe three more shots were fired from the trailer and during a phone conversation with the negotiator he stated that he could see a "guy by a tree" and that he was "fixing to fire" at him. RP (Jury Trial) at 714. Additionally, as the evening progressed it was apparent that the Defendant's life could also be at risk. He indicated that he was suicidal and that he had a self-inflicted gunshot wound in his foot and another to his shoulder.[10]

In a case such as this, establishing telephone contact with the armed, barricaded suspect is important not only to calm the agitated suspect but also to help the police to control a volatile situation. Establishing telephone contact keeps the individual's mind focused on the conversation at hand and not on committing another act of violence. Moreover, it was important to keep the Defendant on the phone so the SWAT team would know exactly where he was when they entered to place him under arrest. Keeping a defendant on the line when the SWAT team enters distracts the defendant and makes injury less likely. An objectively reasonable need to protect the police and the Defendant from immediate danger existed in this case and thus *Miranda* warnings were not required.[11]

---

[10]When Mr. Finch was taken into custody he did not have any gunshot wounds.

[11]Detective Ward testified that he was in the room with Officer Helfers and heard him suggest to the Defendant that he may have shot Ron in self-defense. After a brief pause, Detective Ward testified that Officer Helfers said in response

## Sufficiency of the evidence of premeditation

 The test for reviewing a defendant's challenge to the sufficiency of evidence in a criminal case is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.' " *Pirtle*, 127 Wn.2d at 643 (quoting *Gentry*, 125 Wn.2d at 596-97). All reasonable inferences from the evidence are drawn in favor of the State and interpreted against the defendant. *Pirtle*, 127 Wn.2d at 643; *Gentry*, 125 Wn.2d at 597.

 Premeditation must involve "more than a moment in point of time," RCW 9A.32.020(1), but mere opportunity to deliberate is not sufficient to support a finding of premeditation. *Pirtle*, 127 Wn.2d at 644. Rather premeditation is " 'the deliberate formation of and reflection upon the intent to take a human life' " and involves " 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.' " *Pirtle*, 127 Wn.2d at 644 (quoting *Gentry*, 125 Wn.2d at 597-98 and *State v. Ortiz*, 119 Wn.2d 294, 312, 831 P.2d 1060 (1992)). Premeditation may be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial. *Pirtle*, 127 Wn.2d at 643; *Gentry*, 125 Wn.2d at 597.

A number of appellate cases have considered the sufficiency of evidence with respect to premeditation and demonstrate that a wide range of proven facts will support an inference of premeditation. *See, e.g., State v. Rehak*, 67 Wn. App. 157, 834 P.2d 651 (1992) (evidence showing the victim was shot three times in the head, twice after he had fallen to the floor, was sufficient to show premeditation); *State v.*

to the Defendant's statement "It was premeditated?" RP (Jury Trial) at 1406. The Defendant argues that because the statements made to Officer Helfers should have been suppressed because no *Miranda* warnings were given, Detective Ward's testimony should likewise be suppressed. However, Mr. Finch's statement to Officer Helfers is admissible and thus, the Defendant's arguments with regard to Detective Ward's testimony are without merit.

*Massey*, 60 Wn. App. 131, 803 P.2d 340 (1990) (evidence the defendant brought a gun to the murder site supported finding of premeditation); *State v. Gibson*, 47 Wn. App. 309, 734 P.2d 32 (1987) (evidence of a brief lapse of time between blunt force blows to the head and later strangulation was sufficient to show premeditation); *State v. Sargent*, 40 Wn. App. 340, 698 P.2d 598 (1985) (evidence the victim was struck by two blows, with some interval of time between the blows, while the victim was lying face down supported finding of premeditation).

■ The facts of this case, viewed in the light most favorable to the prosecution, show the following with regard to the shooting of Ron Modlin:

Two or three months before the crime, while Charles Finch was still living with Thelma, a friend of his was over to help fix a fence. His friend testified that, after an unpleasant conversation with Thelma, Charles said, "I thought about buying a gun and shooting him in the head." RP (Jury Trial) at 1941. The jury could have reasonably inferred that Charles was talking about Ron when he made this statement since testimony indicated Ron was Thelma's only male friend.

In July 1994, Thelma and Charles separated. Toward the end of that month, Thelma told Charles that Ron was moving into the Streamliner on the property. Shortly thereafter, Charles started asking other co-workers about buying a gun and eventually acquired a gun on the day of the crime. A few hours after he bought the gun he went over to Thelma's trailer. He entered the trailer with a small box, telling Thelma it was a present. After he entered, Charles yanked the phone out of the wall. Ron then stood up and asked what was going on. In response, Charles opened up the case, took the gun out, loaded the clip, worked the slide, pushed Ron down, said "This," pointed the gun at his head and fired. RP (Jury Trial) at 64.

From this evidence, the jury could reasonably conclude that the Defendant knew Ron was at the property and went there with the intention of killing him. The time and planning here is sufficient to show that Charles reflected upon

his decision to take Ron's life. Additionally, Charles' actions immediately preceding the shooting, opening the case, taking out the gun, loading the clip into the gun, working the slide, shoving Ron, pointing the gun at his head, and firing, indicate premeditation.

There are also statements by the Defendant indicating that he premeditated Ron's death. In his statement to Detective Pince, Charles said he believed Ron had been back at the trailer for a couple of weeks and that he had purchased the gun to protect himself from Ron. Immediately after he shot Ron, Charles stated that "he was planning that for three months." RP (Jury Trial) at 64. Margaret also testified that Charles said he came there that evening to kill Ron, Thelma, and himself. Later that night, police negotiator Officer Helfers asked Charles if he shot Ron in self-defense. Charles responded stating "Hell, it wasn't no self-defense. It was premeditated," to which Detective Helfers asked "are you sure it wasn't in self-defense?" Again Charles stated "No, it was premeditated. I went in and shot him." RP (Jury Trial) at 735.

Charles also wrote several letters one of which said "I did what she wanted me to do. She told me Ron was coming back knowing that I said I would kill him." RP (Jury Trial) at 1984. In another letter Charles wrote, "No one wants my side out. Just that there was some lousy cop killed, and idiot blind person. Nothing about the person that asked her husband to do the killing, promising to stand by him and do whatever it takes to get through this." RP (Jury Trial) at 1990. In sum, the evidence is sufficient for a rational jury to find beyond a reasonable doubt that Charles Finch premeditated the death of Ron Modlin.

Turning to the death of Sgt. Kinard, the evidence of premeditation when viewed in the light most favorable to the State shows the following:

After Charles shot Ron Modlin, he said that he would shoot any officer that came in because "They're lousy." RP (Jury Trial) at 73. Thelma's mother, Margaret, testified that Charles repeated his intent to kill a police officer three times. In fact, during a conversation they had while in the

back bedroom, right before the police arrived, Margaret tried to explain to him that he would be in much more trouble if he shot a police officer. Charles, however, reiterated that he hated cops and if he saw a cop it would be a dead cop. These statements indicate that Charles had time to reflect, deliberate, and even consider the consequences of taking a police officer's life.

Additionally, the evidence shows that Charles was attempting to set a trap for the officers. During the 911 call, he told the operator he would give himself up when the officers arrived. He also said the gun was outside. Instead, Charles had the gun in his hand and went into the back bedroom to watch for the officers to arrive. The jury could reasonably infer that he was intentionally misleading the authorities to lull them into a false sense of security.

When the police arrived, Charles stated that he was not going to leave but told Margaret to go. Sgt. Kinard was the officer communicating with the people in the house. There was also testimony and concern that dogs were barking and indicating the officers' location. Additionally, there was a yard light, porch light and lights on the police cars that were illuminating the area.

Charles' own statements indicate that he knew where the police officers were located when he shot at them. Although he told Detective Pince after the incident that he had shot "randomly" out the window that night, RP (Jury Trial) at 1032, in a letter to Melody Thomas he stated:

> I saw them outside and I shot where I knew they were hoping I hit one. I didn't know that I had hit one until 4:30 AM or after. I didn't know that he was dead until about 9:00 AM on the 16th. So, I did shoot where I did, hoping that I would hit one or at least back them up.

RP (Jury Trial) at 1993-94. Additionally, another friend of Charles asked him if he shot the police officer deliberately and Charles said yes. The jury could reasonably conclude from this evidence that Charles knew where the police officers were and that he shot in that area with the intent to kill one or more of the officers.

Viewing the evidence in the light most favorable to the State, the evidence indicates Charles had threatened to kill any police officer that came to the scene and that he had ample time to reflect upon this decision. The evidence was also sufficient to establish that Charles knew the location of the officers when he fired the rounds from the bedroom window that killed Sgt. Kinard. Thus, we find that sufficient evidence existed for a reasonable trier of fact to conclude that Charles Finch premeditated the deaths of both Ron Modlin and Sgt. Kinard.

Sufficiency of the evidence of the aggravators

In challenges to the sufficiency of the evidence to prove an aggravating factor in aggravated murder, this court must view the evidence most favorably toward the prosecution to determine whether any rational trier of fact could have found the presence of the aggravating factor beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

a. Common Scheme or Plan

The Defendant argues that sufficient evidence does not exist to find that he killed Ron Modlin and Sgt. Kinard as part of a "common scheme or plan." *See* RCW 10.95-.020(10). Under this aggravator multiple murders are required and there must be a " 'nexus between the killings.' " *Pirtle*, 127 Wn.2d at 661 (quoting *State v. Dictado*, 102 Wn.2d 277, 285, 687 P.2d 172 (1984)).

This aggravator may refer to the situation where " 'several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan.' " *Pirtle*, 127 Wn.2d at 662 (quoting *State v. Lough*, 125 Wn.2d 847, 855, 889 P.2d 487 (1995)). The term refers to a larger criminal design, of which the charged crime is only part. *Pirtle*, 127 Wn.2d at 662; *State v. Bowen*, 48 Wn. App. 187, 192, 738 P.2d 316 (1987). To prove the existence of this aggravator the killings must be connected by a larger criminal plan. *Pirtle*, 127 Wn.2d at 662. Thus, the "nexus" exists when an overarching criminal plan connects both murders. *See*

*Pirtle*, 127 Wn.2d at 662; *see also Dictado*, 102 Wn.2d 277 (killings were in furtherance of a gambling scheme); *State v. Grisby*, 97 Wn.2d 493, 496, 647 P.2d 6 (1982) (multiple killings in revenge for being sold bad quality drugs).

In *Pirtle*, the defendant argued that there must be evidence of a plan to commit multiple murders to satisfy this aggravator. This court rejected the argument explaining that it misconstrued common scheme or plan. *Pirtle*, 127 Wn.2d at 663. The court explained the evidence need not show the existence of a plan to kill the named individual or even that the killings be committed for precisely the same reasons, only that the killings are connected by a larger criminal purpose. *Id.*

Drawing all reasonable inferences in favor of the State, the jury could have found that the murders were committed in the course of the Defendant's plan to kill Thelma, himself, Ron and whoever else was at the trailer that evening or got in the way. At the least, the Defendant had a plan, as shown by the evidence, to go to Thelma's home and kill her and himself. For a month prior to the killing, the Defendant asked several co-workers about buying a gun. He asked his boss if he could take the 16th and 17th of August off work. He also asked Thelma on different occasions if she had paid her burial insurance. He took money out of his account and purchased the gun. He even planned to conceal the weapon by telling her it was a present for her birthday.

As discussed above, the jury could have reasonably found that killing Ron was a part of Charles' plan that evening. Knowing that Ron was moving back in, the jury could infer that Mr. Finch knew he would be there that evening. Upon entering the trailer he loaded his gun and killed Ron. This could be viewed as part of an overall plan.

With regard to Sgt. Kinard, the jury could have reasonably found that Mr. Finch was prepared to kill anyone who interfered with his plan; therefore, Sgt. Kinard's death was connected to the overall scheme. The Defendant argues

that since Sgt. Kinard was shot as Thelma and Margaret left the trailer, the nexus was broken. However, Charles had not yet carried through with his intention to kill himself. Also, after Margaret and Thelma left the trailer, Charles yelled out to send the women back in. Thus, it could be inferred that he was still intent on carrying out his plan. The fact that he did not succeed in killing himself and Thelma does not affect the analysis. Viewing the evidence in the light most favorable to the State, Sgt. Kinard's murder appears to have been sufficiently connected to Mr. Finch's overall plan to find the existence of this aggravator beyond a reasonable doubt.

b. In the course or furtherance of a burglary

The Defendant argues there was not sufficient evidence to prove Ron Modlin's death was committed in the course or furtherance of a burglary. *See* RCW 10.95.020(11). The jury was properly instructed that "[a] person commits the crime of burglary in the first degree when he or she enters or remains unlawfully in a dwelling with intent to commit a crime against a person or property therein, and if, in entering or while in the dwelling or in immediate flight therefrom, that person or an accomplice in the crime is armed with a deadly weapon or assaults any person therein." CP (Jury Trial) at 617. The jury was also instructed that "[a] person enters or remains unlawfully in or upon premises when he [or she] is not then licensed, invited, or otherwise privileged to so enter or remain." CP (Jury Trial) at 618.

The Defendant argues that the evidence was not sufficient to establish that Mr. Finch entered or remained on the premises unlawfully. The Defendant argues that Thelma never acted to prevent him from entering the trailer that evening. He contends that by asking him not to bring the beer into the house Thelma impliedly invited him to enter.

When Thelma and Charles separated, she asked Charles to move out and not to return. She also asked him to give his key back but he refused. When Charles arrived at Thelma's she did tell him not to bring the beer inside. However,

she also testified that she did not give him permission to enter. She testified that the sliding glass door was already open when he arrived and that she didn't have a chance to say anything stating that he "brushed against [her] real fast and walked in the house." RP (Jury Trial) at 212.

 Additionally, the Defendant told Detective Pince that he was not invited to enter the trailer and that the women explicitly told him not to come in. Mr. Finch stated "[t]hey [Margaret and Thelma] told me not to come in." RP (Jury Trial) at 1038. The Defendant, however, argues that the corpus delicti rule prohibits a conviction based on a confession absent a prima facie case that the crime has been committed. The crime for which the defendant has been convicted is first degree aggravated murder, not burglary. Proof that a burglary was committed in the course of the murder is only an element of the charge. Therefore, the statement can be used to prove the existence of this aggravator.

The corpus delicti rule prohibits the admission of a confession absent prima facie evidence that a crime has been committed. *See State v. Aten*, 130 Wn.2d 640, 655-56, 927 P2d 210 (1996). The purpose of the rule is to prevent a person from being convicted based on a confession to a crime that has not been committed. *City of Bremerton v. Corbett*, 106 Wn.2d 569, 576-77, 723 P.2d 1135 (1986); *State v. Dodgen*, 81 Wn. App. 487, 492, 915 P.2d 531 (1996). The Defendant in this case was convicted of first degree aggravated murder of Ron Modlin. In a homicide case, the corpus delicti consists of two elements the State must prove at trial; (1) the fact of a death and (2) a causal connection between the death and a criminal act. *Aten*, 130 Wn.2d at 655.

Corpus delicti is more than adequately established in this case. There is clearly sufficient independent evidence of Ron's death at the hands of the Defendant. Establishing that the homicide occurred in the course of a burglary is but an aggravator of the initial charge of murder and was not charged as a separate crime. Therefore, once corpus de-

licti for the charge of first degree aggravated murder has been established, the statement may be used as proof of the existence of this aggravator.

Turning to whether the evidence was sufficient in this case to establish that Ron's murder was committed in the course or furtherance of a burglary, we find the evidence sufficient to establish the presence of this aggravating factor. The evidence noted above, along with the Defendant's actions before the crime, including obtaining a gun and asking Thelma if she had paid her burial insurance, indicate that he unlawfully entered Thelma's trailer that evening to commit a crime therein.

Prosecutorial Misconduct

The Defendant contends that he was denied a fair trial because the prosecutor made improper statements in his rebuttal closing argument. Trial court rulings based on allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard. *Stenson*, 132 Wn.2d at 718; *Brett*, 126 Wn.2d at 174; *Lord*, 117 Wn.2d at 887. In making such a challenge the defendant bears the burden of establishing that the prosecutor's conduct was both improper and prejudicial. *Stenson*, 132 Wn.2d at 718; *Gentry*, 125 Wn.2d at 640. If the prosecutor's conduct is improper it does not constitute prejudicial error unless the appellate court determines there is a substantial likelihood the misconduct affected the jury's verdict. *Stenson*, 132 Wn.2d at 719; *Brett*, 126 Wn.2d at 175.

If the defendant fails to object to an improper remark it is considered waived unless the remark is "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Stenson*, 132 Wn.2d at 719; *Gentry*, 125 Wn.2d at 596. In this case, since the Defendant did not object to any of the Prosecutor's statements this latter standard will apply.

The relevant portion of the Prosecutor's rebuttal closing statement, with the language objected to by the Defendant underlined, reads as follows:

Ladies and gentleman, when something happens in a civilized land, we want that something to be dealt with by the rule of law and we need somebody to make the decision. We can't call everybody in Snohomish County down to the courthouse to have a trial for what happened here if, for no other reason, that there's no place big enough to put everybody and society would grind to a halt. So we bring in a representative sampling of the community to make the decision and you are the representative sampling of that community.

We put on a trial and we tell you what the facts are or what the evidence is from which you may find the facts and the Judge tells you what the law is, and then you're told "Okay, now you've heard all the evidence and you've heard all the law. Now go back there and you all figure this out." And that's going to happen here in just a couple of minutes.

In this way and following the law, as you have to do, you are the conscience of the community; you are the voice of the law in the community. We talked earlier. Raised the question during voir dire; I raised it during closing argument about how important it is that the verdict that you reach in this case should represent the truth, and it should. You all agreed with that. We are ultimately here about justice and your verdict should not only be a truthful verdict, but it should be a just verdict.

RP (Jury Trial) at 2350-51.

Relying on Washington Court of Appeals' decisions in *State v. Bautista-Caldera*, 56 Wn. App. 186, 783 P.2d 116 (1989), and *State v. Coleman*, 74 Wn. App. 835, 876 P.2d 458 (1994), the Defendant asserts that the challenged statements by the Prosecutor were improper. In *Bautista-Caldera*, the defendant appealed his conviction of first degree statutory rape and one count of indecent liberties arguing, among other things, that prosecutorial misconduct during closing argument denied him a fair trial. *Bautista-Caldera*, 56 Wn. App. at 193. The court found the following statements by the prosecution to be improper:

[D]o not tell that child that this type of touching is okay, that this is just something that she will have to learn to live with.

Let her and children know that you're ready to believe them and [e]nforce the law on their behalf.

*Id.* at 195. The court found the prosecution's plea improper because it "in effect exhorts the jury to send a message to *society* about the general problem of child sexual abuse." *Id.*

In *Coleman* the prosecutor presented a short rebuttal closing with the following comments:

> It is your job to apply the facts to the law, and we cannot second guess you, and will not second guess you, and if you determine that the only thing that happened here was a theft then that is your judgment. And you are entitled to make it, but I would suggest to you that to do so you have to do two things. And one is to ignore the actual evidence in front of you, and the second is thereby to violate your [oa]th as jurors.

*Coleman*, 74 Wn. App. at 838.

The court found the above argument to be improper because it implied that the jury would violate its oath if it disagreed with the State's theory of the evidence. The court relied in part on the Supreme Court's opinion in *United States v. Young*, 470 U.S. 1, 18, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985), where the Court found it was error for the prosecutor to try to exhort the jury to "do its job." *Id.*

The Defendant contends that the challenged comments by the prosecution improperly exhorted the jury to "do its job" as a representative of the community and improperly implied that anything less would be a failure of the rule of law or a failure to meet the requirements of a civilized land.

▆ While the prosecutor's remarks here constitute an appeal to the jury to act as the conscience of the community, they do not rise to the level of improper conduct seen in *Young, Coleman* or *Bautista-Caldera*. Moreover, although the courts in *Coleman* and *Bautista-Caldera* found that the prosecutors acted improperly they did not find prejudicial error. In *Coleman*, the court found no substantial likeli-

hood that the misconduct affected the verdict. *Coleman*, 74 Wn. App. at 841. The court explained that while it did not condone the comments, they were tempered by the preceding comments that "we cannot second guess you, . . . and if you determine that the only thing that happened here was a theft then that is your judgment." *Id.* These comments, reasoned the court, indicated that the jury's verdict would be honored and outweighed the prosecutor's improper comments. *Id.* The court in *Bautista-Caldera* found the improper statements did not create any prejudice that could not have been neutralized with a curative instruction. *Bautista-Caldera*, 56 Wn. App. at 195.

Additionally, federal courts have found, as a general rule, that "appeals for the jury to act as a conscience of the community are not impermissible, unless specifically designed to inflame the jury." *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984); *accord United States v. Bascaro*, 742 F.2d 1335, 1354 (11th Cir. 1984); *United States v. Kopituk*, 690 F.2d 1289, 1342-43 (11th Cir. 1982); *United States v. Lewis*, 547 F.2d 1030, 1036-37 (8th Cir. 1976); *United States v. Alloway*, 397 F.2d 105, 113 (6th Cir. 1968). There is nothing in the Prosecutor's argument to indicate it was specifically designed to inflame the jury. Thus, we find that the statements made by the Prosecutor during rebuttal closing did not amount to prosecutorial misconduct.

<u>Mr. Finch's appearance in court in shackles and handcuffs</u>

The Defendant argues that the trial court erred in its decision to have him shackled throughout the trial and special sentencing proceeding and also handcuffed during the testimony of Margaret Elizares and Thelma Finch. We agree.

 It is well settled that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances. *See, e.g., Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970); *State v. Hartzog*, 96 Wn.2d 383, 635 P.2d 694 (1981); *State v. Ollison*, 68 Wn.2d 65, 411 P.2d 419 (1966); *State v. Sawyer*, 60 Wn.2d 83, 371 P.2d 932 (1962); *State v.*

*Williams*, 18 Wash. 47, 50 P. 580 (1897); *State v. Tolley*, 290 N.C. 349, 226 S.E.2d 353 (1976); *Snow v. Oklahoma*, 489 F.2d 278 (10th Cir. 1973); *Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir. 1973); *United States ex rel. Stahl v. Henderson*, 472 F.2d 556 (5th Cir. 1973); *United States v. Roustio*, 455 F.2d 366 (7th Cir. 1972); *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970); *United States v. Thompson*, 432 F.2d 997 (4th Cir. 1970); *United States v. Samuel*, 431 F.2d 610 (4th Cir. 1970); *Loux v. United States*, 389 F.2d 911 (9th Cir. 1968); *Blaine v. United States*, 136 F.2d 284 (D.C. Cir. 1943); *People v. Thomas*, 1 Mich. App. 118, 134 N.W.2d 352 (1965); *Commonwealth v. Brown*, 364 Mass. 471, 305 N.E.2d 830 (1973); *State v. Borman*, 529 S.W.2d 192 (Mo. Ct. App. 1975); *State v. Roberts*, 86 N.J. Super. 159, 206 A.2d 200 (1965); *French v. State*, 377 P.2d 501 (Okla. Crim. App. 1962); *Commonwealth v. Cruz*, 226 Pa. Super. 241, 311 A.2d 691 (1973); *Thompson v. State*, 514 S.W.2d 275 (Tex. Crim. App. 1974); *Sparkman v. State*, 27 Wis. 2d 92, 133 N.W.2d 776 (1965).

This is to ensure that the defendant receives a fair and impartial trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 3 and article I, section 22 (amendment 10) of the Washington State Constitution. *See Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986); *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); *Hartzog*, 96 Wn.2d at 397-98.

This court has emphasized:

> Section 22, art. 1, of our constitution, declares that, "In criminal prosecutions the accused shall have the right to appear and defend in person." The right here declared is to appear with the use of not only his mental but his physical faculties unfettered, and unless some *impelling necessity* demands the restraint of a prisoner to secure the safety of others and his own custody, the binding of the prisoner in irons is a plain violation of the constitutional guaranty.

*Hartzog*, 96 Wn.2d at 398 (quoting *Williams*, 18 Wash. at 51).

Courts have recognized that restraining a defendant during trial infringes upon this right to a fair trial for several reasons. The one most frequently cited is that it violates a defendant's presumption of innocence. *See Hartzog*, 96 Wn.2d at 398 ("[r]estraints . . . abridge important constitutional rights, including the presumption of innocence").

The presumption of innocence, although not articulated in the Constitution, "is a basic component of a fair trial under our system of criminal justice." *Estelle*, 425 U.S. at 503.

> "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."

*Estelle*, 425 U.S. at 503 (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed. 481 (1895)); *see also Taylor v. Kentucky*, 436 U.S. 478, 483, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978).

Courts have recognized that the accused is thus entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man. *Kennedy*, 487 F.2d at 104; *Samuel*, 431 F.2d at 614; *Eaddy v. People*, 115 Colo. 488, 492, 174 P.2d 717 (1946). Courts of other jurisdictions, including our own, have long recognized the substantial danger of destruction in the minds of the jury of the presumption of innocence where the accused is required to wear prison garb, is handcuffed or is otherwise shackled. *See Allen*, 397 U.S. at 344; *Hartzog*, 96 Wn.2d at 398; *Hickson v. State*, 472 So. 2d 379, 383 (Miss. 1985); *Brewster v. Bordenkircher*, 745 F.2d 913, 916-18 (4th Cir. 1984); *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223 (11th Cir. 1983); *People v. Boose*, 66 Ill. 2d 261, 265, 362 N.E.2d 303, 5 Ill. Dec. 832 (1977); *Kennedy*, 487 F.2d at 105-06; *Hernandez v. Beto*, 443 F.2d 634, 636-37 (5th Cir. 1971); *State v. Crawford*, 99 Idaho 87, 95-96, 577

. P.2d 1135 (1978); *State v. Boyd*, 256 S.W.2d 765, 766 (Mo. 1953); *Schultz v. State*, 131 Fla. 757, 758, 179 So. 764 (1938); *Blair v. Commonwealth*, 171 Ky. 319, 327-29, 188 S.W. 390 (1916).

Shackling or handcuffing a defendant has also been discouraged because it tends to prejudice the jury against the accused. *See Boose*, 66 Ill. 2d at 265; *Kennedy*, 487 F.2d at 105-06; *Tolley*, 226 S.E.2d at 367. Measures which single out a defendant as a particularly dangerous or guilty person threaten his or her constitutional right to a fair trial. *Estelle*, 425 U.S. at 506; *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir. 1987); *United States v. Ferguson*, 758 F.2d 843, 854 (2d Cir. 1985). The Supreme Court has stated that use of shackles and prison clothes are *"inherently prejudicial"* because they are "unmistakable indications of the need to separate a defendant from the community at large." *Holbrook*, 475 U.S. at 568-69 (emphasis added).

When the court allows a defendant to be brought before the jury in restraints the "jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers." *Williams*, 18 Wash. at 51; *Kennedy*, 487 F.2d at 106. The Supreme Court of California notes that the prejudice to a defendant is particularly apparent where the defendant is accused of a violent crime.

> When a defendant is charged with any crime, and particularly if he is accused of a violent crime, his appearance before the jury in shackles is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged.

*People v. Duran*, 16 Cal. 3d 282, 290, 545 P.2d 1322, 127 Cal. Rptr. 618, 90 A.L.R.3D 1 (1976).

Shackling or handcuffing a defendant has also been discouraged because it restricts the defendant's ability to assist his counsel during trial, it interferes with the right to testify in one's own behalf, and it offends the dignity of the judicial process. *See Allen*, 397 U.S. at 344; *Hartzog*, 96 Wn.2d at 398; *Boose*, 66 Ill. 2d at 265; *Kennedy*, 487 F.2d at 105-06; *Tolley*, 226 S.E.2d at 367.

"[C]lose judicial scrutiny" is required to ensure that inherently prejudicial measures are necessary to further an essential state interest. *Estelle*, 425 U.S. at 504; *Holbrook*, 475 U.S. at 568. This close judicial scrutiny of inherently prejudicial practices has not always led to reversal however. In *Illinois v. Allen*, the Court emphasized that a defendant may be prejudiced if he appears before the jury bound and gagged. "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Allen*, 397 U.S. at 344. Yet the Court nonetheless observed that in certain extreme situations "binding and gagging might possibly be the fairest and most reasonable way to handle" a particularly obstreperous and disruptive defendant. *Id.*

When determining whether restraints should be used during a courtroom proceeding this court has stated:

> A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be 'potentially dangerous' is a failure to exercise discretion.

*Hartzog*, 96 Wn.2d at 400.

Thus, this court and courts of other jurisdictions have universally held that restraints should "be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape."[12] *Hartzog*, 96 Wn.2d at 398; *see also Ollison*, 68 Wn.2d at 69; *Sawyer*, 60 Wn.2d at 86; *State v. Early*, 70

---

[12] All cases which have upheld the trial court's decision to handcuff or shackle a defendant have done so only where the defendant presented a threat of escape, a threat of injury to others, or had disrupted the trial court proceedings. *See United States v. Kress*, 451 F.2d 576 (9th Cir. 1971) (defendant escaped custody for two months); *State v. Tolley*, 290 N.C. 349, 226 S.E.2d 353 (1976) (defendant

Wn. App. 452, 462, 853 P.2d 964 (1993); *Hardin v. Estelle*, 365 F. Supp. 39, 45 (W.D. Tex), *aff'd*, 484 F.2d 944 (5th Cir. 1973); *Hernandez*, 443 F.2d at 636; *Way v. United States*, 285 F.2d 253, 254 (10th Cir. 1960); *Boose*, 66 Ill. 2d at 265; *Kennedy*, 487 F.2d at 105; *Woodwards v. Cardwell*, 430 F.2d 978, 982 (6th Cir. 1970); *Brown*, 364 Mass. at 475; *Duckett v. Godinez*, 67 F.3d 734, 748 (9th Cir. 1995); *Hamilton v. Vasquez*, 17 F.3d 1149, 1154 (9th Cir. 1994); *United States v. Baker*, 10 F.3d 1374, 1401-02 (9th Cir. 1993); *Duran*, 16 Cal. 3d at 290; *United States v. Theriault*, 531 F.2d 281, 284-85 (5th Cir. 1976); *Tolley*, 226 S.E.2d at 367.

attempted escape during preliminary hearing); *Jones v. Meyer*, 899 F.2d 883 (9th Cir. 1990) (defendant threatened physical injury to a codefendant, the bailiff and his own counsel); *United States v. Samuel*, 433 F.2d 663 (4th Cir. 1970) (defendant and codefendant posed threat to a government informer who was to testify at trial); *Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir. 1994) (defendant assaulted his counsel, sexually assaulted his counsel's assistant, and verbally assaulted and exhibited violent behavior toward deputies bringing him from his cell to the courthouse); *United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993) (defendants threatened government witnesses during pretrial proceeding and while in custody several of the defendants conspired to kill a government witness and discussed the murder of the FBI agent in charge of the case); *Loux v. United States*, 389 F.2d 911 (9th Cir. 1968) (all three appellants had significant histories of escape); *King v. Rowland*, 977 F.2d 1354 (9th Cir. 1992) (defendant attacked people in the courtroom, including his attorney, and verbally abused the judge); *Stewart v. Corbin*, 850 F.2d 492 (9th Cir. 1988) (defendant escaped custody twice, assaulted officers in the courtroom, threatened the judge, attorney, etc.); *Patterson v. Estelle*, 494 F.2d 37 (5th Cir. 1974) (defendant made several successful and unsuccessful attempts to escape from custody); *Hellum v. Warden*, 28 F.3d 903 (8th Cir. 1994) (defendant attempted escape on five occasions, three of which were successful); *State v. Johnson*, 499 S.W.2d 371 (Mo. 1973) (at the conclusion of the State's case the defendant broke loose from the sheriff in an attempt to escape); *State v. Jones*, 311 Minn. 176, 247 N.W.2d 427 (1976) (the defendant repeatedly acted in a disorderly manner); *People v. Rogers*, 187 Colo. 128, 528 P.2d 1309 (1974) (although repeatedly warned, defendant made numerous outbursts during trial); *State v. Moen*, 94 Idaho 477, 491 P.2d 858 (1971) (defendants were on trial for escaping from the County Jail and the trial court had other evidence of a possible escape plan); *United States v. Thompson*, 432 F.2d 997 (4th Cir. 1970) (the judge had information that if the defendants were not restrained that they might, aided by spectators, attack another inmate, who, in the role of informer, appeared as a witness against them); *People v. Kimball*, 5 Cal. 2d 608, 55 P.2d 483 (1936) (defendant expressed intention to escape, threatened to kill witnesses and secreted lead pipe into courtroom); *People v. Burwell*, 44 Cal. 2d 16, 279 P.2d 744 (1955) (defendant wrote letters stating he intended to procure a weapon and escape from the courtroom with the aid of friends); *People v. Stabler*, 202 Cal. App. 2d 862, 21 Cal. Rptr. 120 (1962) (defendant attempted escape from county jail while awaiting trial on other escape charges); *State v. Simmons*, 26 Wn. App. 917, 614 P.2d 1316 (1980) (repeated escapes and evidence that others intended to break the defendant out during the trial).

Citing the North Carolina Supreme Court decision of *State v. Tolley*, this court in *Hartzog* also set forth several factors that a trial court could consider in deciding whether to use physical restraints:

[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Hartzog*, 96 Wn.2d at 400 (quoting *State v. Tolley*, 290 N.C. 349, 368, 226 S.E.2d 353 (1976)). This court did not actually apply these factors in *Hartzog* because it was reviewing a general security order applicable to all defendants and witnesses who were penitentiary inmates requiring them to remain in arm and leg restraints while in court. *Id.* at 386-87. This court found the general policy of restraint to be unconstitutional. *Id.* at 400-01.[13]

Although these factors were listed by the Supreme Court of North Carolina over 30 years ago, they have been cited in only a limited number of cases. *See Boose*, 66 Ill. 2d at 263; *Stockton v. Commonwealth*, 241 Va. 192, 402 S.E.2d 196 (1991). While this court, too, has cited the factors,

---

[13]Decisions of this court do not provide particular guidance in this case because the factual circumstances of the cases are substantially different. Only one case, decided in 1897, by this court, has involved a particularized determination by a trial court judge that a defendant is to be shackled or handcuffed during trial. *See State v. Hartzog*, 96 Wn.2d 383, 635 P.2d 694 (1981) (general policy requiring all inmates to be restrained while in court); *State v. Ollison*, 68 Wn.2d 65, 411 P.2d 419 (1966) (a deputy handcuffed the defendant following adjournment of the first day of trial and a few jury members saw the incident, however, error was harmless); *State v. Sawyer*, 60 Wn.2d 83, 371 P.2d 932 (1962) (deputy handcuffed the defendant after court was adjourned in the presence of some of the jury members, however, error was harmless). In *State v. Williams*, this court found reversible error where the defendant appeared during the trial in shackles and also where various defense witness were also physically restrained while they testified. *State v. Williams*, 18 Wash. 47, 50 P. 580 (1897).

simply listing these factors, without more, is not particularly helpful. The court in *Tolley* did not indicate how these factors are to be used, i.e., what factors could and could not be determinative in a trial court's decision to restrain a defendant during trial.[14]

The court in *Tolley* did recognize that a trial court is to use physical restraints only when necessary to "prevent escape, to protect others in the courtroom or to maintain order during trial." *Tolley*, 226 S.E.2d at 367. Thus, only factors which indicate a manifest need for some measure to be taken to maintain the security of the courtroom should be considered. *Id.*; *Boose*, 66 Ill. 2d at 265; *Duran*, 16 Cal. 3d at 290; *see also Theriault*, 531 F.2d 281; *Kennedy*, 487 F.2d at 105-06. In *Tolley*, the trial court's decision to restrain the defendant during trial was upheld because the defendant attempted to escape during the preliminary hearing. *Tolley*, 226 S.E.2d at 363-64.

The problem with the *Tolley* factors is that a number of the factors could be present but still not indicate a "manifest need" to restrain the defendant. For example, the Illinois Supreme Court listed the factors in *People v. Boose* and found that, although one of the factors was present, it did not justify the court's decision to shackle the defendant during his competency hearing. In *Boose*, the court found that the trial court abused its discretion where it based its decision to restrain the defendant on the fact that he was accused of murdering a guard while in prison. Although the court recognized that the seriousness of the offense charged is one of the factors to be considered by the trial court, "we cannot say that . . . it . . . is enough to sustain this court's ruling." *Boose*, 66 Ill. 2d at 267. The court stated that "[i]f the shackling here were judged defensible it would seem all persons accused of violent crimes could be shackled in the jury's presence solely because of the character of the crimes charged." *Id.*

---

[14]As in *Tolley* and *Hertzog*, this court in its recent decision in *State v. Hutchinson*, 135 Wn.2d 863, 959 P.2d 1061 (1998) also listed these same factors but had no occasion to analyze their significance.

The Supreme Court of California also found that the trial court abused its discretion when it ordered the defendant to be shackled during trial. The court stated that there was "no showing that defendant threatened to escape or behaved violently before coming to court or while in court. The fact that defendant was a state prison inmate who had been convicted of robbery and was charged with a violent crime did not, without more, justify the use of physical restraints." *Duran*, 16 Cal. 3d at 293. Although the facts of the case satisfied two of the factors listed above, the use of shackles was not found to be justified.

It is clear that the existence of one or more factors does not necessarily mean that a defendant should be restrained. Courts must consider only those factors which indicate that "compelling circumstances that some measure [is] needed to maintain security of the courtroom." *Duckett*, 67 F.3d at 748 (citations omitted). The trial court must base its decision to physically restrain a defendant on evidence which indicates that the defendant poses an imminent risk of escape, that the defendant intends to injure someone in the courtroom, or that the defendant cannot behave in an orderly manner while in the courtroom. To do otherwise is an abuse of the trial court's discretion.

Finally, the Supreme Court has cautioned that the use of handcuffs, shackles and other forms of physical restraints should be used only as measures of "last resort." *Allen*, 397 U.S. at 344. Thus, the court must consider less restrictive alternatives before imposing physical restraints. *Duckett*, 67 F.3d at 748; *Jones v. Meyer*, 899 F.2d 883, 885 (9th Cir. 1990); *Spain v. Rushen*, 883 F.2d 712, 720 (9th Cir. 1989); *Kennedy*, 487 F.2d at 111; *Hamilton*, 17 F.3d at 1154; *United States v. Baker*, 10 F.3d 1374, 1401-02 (9th Cir. 1993); *State v. Jones*, 311 Minn. 176, 181-82, 247 N.W.2d 427 (1976); *Elledge*, 823 F.2d at 1451.

In the present case, the Defendant was shackled during the entire course of his trial and special sentencing proceeding. He was further restrained during Thelma's and Margaret's testimonies by having his right hand handcuffed

to his chair and his shackles handcuffed to the table leg. The judge based his decision to restrain the Defendant on the fact that, while in custody, he had repeated his desire to kill Thelma to doctors from Western State Hospital. Additionally, the State and correctional officers were concerned because "he's a rather large man . . . and once he got going, he'd have quite a lot of momentum." RP (Pretrial) at 1135. The State also noted that the courtroom was small and Thelma would have to pass within close proximity of the Defendant.

Although the court had some concerns with regard to Thelma, these concerns do not justify the court's decision to shackle Mr. Finch when she was not testifying. There is no indication from the record or the hearing on this matter that the Defendant posed a threat to anyone else in the courtroom, that the Defendant posed an escape risk, or that he had been disruptive during courtroom proceedings. The State, however, argues that the trial court's decision was justified because Mr. Finch was on trial for murder, he had prior convictions for "violent" offenses, he was a large man, and he attempted suicide while he was in prison.

First, the trial court did not indicate that anything but the size of the Defendant and his threats toward Thelma formed the basis for his decision. Second, and more importantly, these facts do not indicate a "manifest need" for restraints. Thus, the decision to restrain Mr. Finch throughout the course of his trial, based on these facts, is contrary to the overwhelming case law in this area. Mr. Finch's prior crimes were committed over 25 years earlier and none involved a conviction for escape. Additionally, during his incarceration he had no history of violence and he never attempted escape. Moreover, the crimes charged in this case do not warrant physical restraints. A defendant is presumed innocent when he stands trial and, as stated above, to justify the imposition of restraints based on the charge in this case would mean that every person charged with aggravated first degree murder could then be restrained during trial.

Mr. Finch did attempt suicide while in custody; however,

this does not evince a need for physical restraints. Mr. Finch attempted suicide in September 1994, eight months prior to trial, and there was no evidence in the record that he was suicidal at the time of trial. After he was placed on antidepressant medication no suicidal notions were present. The State does not cite to, and this court cannot find any case which has allowed physical restraints in such circumstances.

Moreover, the Defendant attended numerous pretrial proceedings in which he was completely compliant with the decorum of the court. In fact, during one of the pretrial proceedings, Thelma testified and also had to pass very close to the Defendant. The trial judge noted as much stating that "so far during any court proceedings, there have been absolutely no problems with Mr. Finch's behavior, and that included a brief period of testimony of Thelma Finch." RP (Pretrial) at 1148. However, the court still allowed the Defendant to be restrained throughout the entire trial and special sentencing proceeding stating:

> I am concerned during the course of the trial, as things are unfolding concerning the events that allegedly took place in August, that we're going to need to have the courtroom controlled in a fashion that protects everyone within it. I don't think I can ignore the concerns of the Department of Corrections' personnel who are responsible for the courtroom safety of individuals and the protection of both the public and Mr. Finch.

RP (Pretrial) at 1148. These were the trial court's reasons for shackling the Defendant during the course of the trial. The judge's reasons do not indicate any concern that the Defendant was an escape risk, that he was an imminent threat to those in the courtroom, or that he was a disruptive presence. A concern that a defendant is "potentially dangerous" is not sufficient to warrant the restraint of the defendant. *See Hartzog*, 96 Wn.2d at 400 ("imposing physical restraints upon prison inmates charged with new offenses because they may be 'potentially dangerous' is a failure to exercise discretion").

Additionally, the deference given to the correctional officers is error. Courts have specifically found reversible error where the trial court based its decision solely on the judgment of correctional officers who believed that using restraints during trial was necessary to maintain security, while no other justifiable basis existed on the record. *See People v. Vigliotti*, 203 A.D.2d 898, 611 N.Y.S.2d 413 (1994); *People v. Thomas*, 125 A.D.2d 873, 510 N.Y.S.2d 460 (1986).

The trial court's decision to shackle Mr. Finch during the trial and sentencing was clearly an abuse of discretion. Mr. Finch was never disruptive in court, he was not an escape risk, and he posed no threat to anyone other than, possibly, Thelma. The trial court's decision was error.

Next, we turn to the trial court's decision to use restraints during the testimony of Margaret and Thelma. During their testimony, the Defendant's shackles were handcuffed to the table leg and his right hand was handcuffed to the chair. However, with regard to Margaret, the court stated "I've not heard anything in particular with respect to Ms. Elizares that causes the same concerns [as with Thelma] and I wouldn't have any special rulings with respect to her testimony." RP (Pretrial) at 1150. There was no reason for the use of these additional restraints during Margaret's testimony. Again, this is error.

With regard to Thelma, the court allowed restraints based on the fact that Mr. Finch threatened to kill Thelma if he had the opportunity. This was ordered despite the fact that Thelma previously testified in the presence of the Defendant, walking directly by him, with no incident. Although the Defendant had caused no disruption during the preliminary hearings, the Defendant's statements could warrant some precautionary measures. However, during the course of the hearings, the trial judge did not consider any less restrictive alternatives. This court in *Hartzog* noted that the court should consider other alternatives such as the "relocation of the witness stand[,] . . . the reasonable use of additional security personnel[,] . . . [and] the use of metal detectors and other security devices."

*Hartzog*, 96 Wn.2d at 401 (quotation marks omitted) (quoting *State v. Hartzog*, 26 Wn. App. 576, 589, 615 P.2d 480 (1980)); *see also Elledge*, 823 F.2d at 1439 (although the defendant threatened courtroom personnel and was proficient at karate, there was no indication that the trial court considered less restrictive alternatives to placing the defendant in leg irons for the remainder of the sentencing phase of capital trial and therefore the court reversed and remanded for resentencing); *Hardin*, 365 F. Supp. 39 (although defendant posed an escape risk the trial court did not consider less restrictive means to shackling the defendant throughout trial and therefore the court set aside the conviction).

No alternatives were considered by the trial court in this case. Thus, even if the trial court were warranted in taking precautions during Thelma's testimony, the court erred by not considering the use of less restrictive methods rather than physically restraining him in the presence of the jury.

Next, we determine if these errors require reversal of the jury's determination of guilt and their imposition of the death penalty.

The State argues that any error made by the trial court was harmless because it took precautions that would have precluded the jury from seeing the Defendant's leg shackles. When the Defendant's motion to be unrestrained during trial was denied, the trial court ordered that skirts be placed around counsel tables which would have obstructed the jury's view of the shackles.

The State argues that but for the Defendant's motion to remove the skirts the jury would not have seen the shackles. During jury voir dire, on April 27, 1994, the Defendant did ask the trial court to remove the skirting around counsel table. This, however, was only after the Defendant was brought into the Ginni Stevens Hearing Room wearing leg restraints during the voir dire proceedings beginning on April 13, 1994, in front of the potential jury members. The trial court discussed, on the record, the fact that the Defendant would be entering the room with his shackles on in the presence of the jury and found that it

was inevitable that the jury would see the shackles as Mr. Finch entered the room.

> I should just indicate in terms of what the jury may or may not see, the jury may well be able to see that there's some restraining going on and I don't think there's any way of avoiding that.

RP (Pretrial) at 1271. There is no indication in the record why the Defendant could not have been brought in and out of the room outside the presence of the jury.

Only after the Defendant was required to enter the courtroom in leg restraints in front of the jury panel during the jury voir dire proceedings did defense counsel ask for the removal of the skirts. Defense counsel stated that, after a discussion with Mr. Finch, they concluded the skirts were "counterproductive." RP (Supplement) at 3. The Defendant argues that since he was entering the hearing room in shackles in the presence of the jury panel, placement of table skirts would no longer serve the purpose for which they were intended, that is, to keep the jury from seeing his leg restraints. Additionally, the Defendant did not want the jury to speculate as to what, if any, other safety measures were being hidden by the skirts. The skirts were removed for the remainder of the trial.

Because the record was unclear as to the extent to which the jury could detect that the Defendant was physically restrained, this court remanded for a hearing on the following questions:

> (1) Was it possible for the jury to see that the Defendant was restrained when entering, leaving or sitting in the hearing room?
>
> (2) If the restraints were not visible, was it possible for the jury to know that the Defendant was restrained in some way based on a restriction of the Defendant's movements?

Washington State Supreme Court Order (Feb. 20, 1998).

On April 9, 1998, pursuant to that order, the trial court held a hearing and answered both questions in the nega-

tive. The trial court's conclusions, however, were based on conflicting findings which proved both confusing and beyond the scope of this court's order.

Factual findings are erroneous where not supported by substantial evidence in the record. *State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994). Substantial evidence exists where there is a "sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *Id.* at 644 (citing *State v. Halstien*, 122 Wn.2d 109, 128, 857 P.2d 270 (1993)).

With regard to the first question of our February 20, 1998 order, the trial court found that the Defendant wore Velcro leg restraints placed under his pant leg and snugly around his lower ankles. RP (Remand Hearing) at 6. The restraints made no noise which could have been heard by the jurors. *Id.* The effect of the restraints was to shorten the Defendant's stride. RP (Remand Hearing) at 8.

The Defendant entered the hearing room after the jurors were seated. RP (Remand Hearing) at 6. When the Defendant was sitting, his lower body was completely obscured by the second tier in the hearing room so that the jury could not have seen his restraints in such a position. RP (Remand Hearing) at 7-8. When the Defendant was escorted into and out of the hearing room, the court found that he was surrounded by three officers and his two attorneys. RP (Remand Hearing) at 7. The court further found that even if the jurors were standing, the Defendant's position with respect to the jury's view was blocked so that they could not see the Defendant's restraints. RP (Remand Hearing) at 10. The trial court did note, however, that a number of photographs admitted into evidence showed that it was possible, from certain positions in the hearing room, that someone could see the Defendant's ankles if he were in an "exaggerated position, with his leg fully extended, not in any natural fashion in which someone would negotiate steps and not one which was required by the leg restraints placed upon the defendant." RP (Remand Hearing) at 9. However, from the jury's seated position in the room, the

photographs demonstrated it would have been impossible to actually see the Defendant's shackled ankles. RP (Remand Hearing) at 8-9. The trial court concluded that it was not possible for the jury to see that the Defendant was restrained when he was entering, leaving or sitting in the hearing room.

With regard to the second question, the trial court found that the Defendant's movements were noticeably restricted. This is because the restraints caused the Defendant to walk slowly and his stride to be obviously shortened. RP (Remand Hearing) at 10, 12. As the trial court itself found, "the effect of the Velcro restraint was to shorten the defendant's stride. They would have served no purpose otherwise." RP (Remand Hearing) at 8. The court noted that it was certainly possible for the jury to notice the Defendant's obviously restricted movements, and that some jurors may have speculated that he was in fact restrained. RP (Remand Hearing) at 12-13. At the same time, however, the court indicated that the jury could have speculated as to a number of other reasons why Defendant's movements were restricted—"the solemnity of the occasion, the fact that the defendant was surrounded by a group of people, the fact that he may have been looking at jurors when he walked out . . . ." *Id.* The trial court concluded that it was not possible for the jury to know that the Defendant was restrained based on his movements.

The trial court's reasoning is confusing, inconsistent with its earlier observations, and does not support its conclusion. Regardless of whether the jury may have speculated as to other reasons for the Defendant's restricted movements, it was clearly possible that the jury could have known that the Defendant was restrained. As the court itself found, "it was clear that the defendant's movements were restricted." RP (Remand Hearing) at 12. The restraints caused the Defendant's restricted movements, not the solemnity of the occasion or the individuals who escorted him. The Defendant's obviously slow walk and shortened stride were caused by the restraints, so much so

that the Defendant could not walk or extend his leg in "any natural fashion in which someone would negotiate steps." RP (Remand Hearing) at 9. These facts, together with the trial court's original remarks on the record—cautioning that the "jury may well be able to see that there's some restraining going on . . . I don't think there's any way of avoiding that"—reveal that it was indeed possible for the jury to know that Defendant was restrained based on the restriction of his movements. RP (Pretrial) at 1271.

The trial court found that it was clear the restriction of the Defendant's movements was caused by the restraints. The jury could observe the impact of the restraints because the Defendant's walk was slow, his stride obviously shortened. The trial court also found that it was possible that the jury could have inferred that the Defendant was restrained. In light of these findings and the trial court's original remarks indicating the inevitability that the jury would observe that "there's some restraining going on," clearly it was possible for the jury to know that he was restrained. RP (Pretrial) at 1271. Even if the table skirts remained attached to the Defendant's table, they would not have mitigated the trial court's error since the jury would have known he was physically restrained.

The State also argues that but for defense counsel's actions drawing attention to the fact that the Defendant was handcuffed, the jury would not have noticed the additional use of those restraints. At the end of Thelma's testimony and right before the next witness was called, counsel for the Defendant asked if, pursuant to the judge's order, the Defendant could be released from the handcuff. The bailiff then unhandcuffed him in the presence of the jury. Although the defense counsel's actions did draw attention to the handcuff, this action does not alter our analysis.

The record does not indicate whether the jury could, in fact, see the additional use of handcuff, or that the Defendant's leg shackles were also handcuffed to the table during the testimony of Thelma and Margaret. However, because

the defendant was handcuffed to his chair he could not stand up when court was brought into session. Additionally, the trial court made no effort to conceal the handcuff and specifically noted that he was "concerned with arm restraints because it's tough to make them not visible." RP (Pretrial) at 1149. Thus, the fact that defense counsel brought attention to the handcuff does not affect the inquiry where the handcuffs were likely visible to the jury and the jury knew that Defendant wore other restraints throughout his trial.

 Generally, an error that violates a constitutional right of the accused is presumed to be prejudicial. *See State v. Stephens*, 93 Wn.2d 186, 607 P.2d 304 (1980). The appellate court determines whether the State has overcome the presumption from an examination of the record, from which it must affirmatively appear the error is harmless beyond a reasonable doubt. *See State v. Belmarez*, 101 Wn.2d 212, 676 P.2d 492 (1984) (error in instruction on deadly weapon was of constitutional magnitude and not harmless). The rule is occasionally stated in its approximate converse, i.e., that the error is harmless if the evidence against the defendant is so overwhelming that no rational conclusion other than guilt can be reached. *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985).

Many courts have found that where the trial court has abused its discretion allowing the defendant to be physically restrained during trial, such an error is not harmless. *See Vigliotti*, 203 A.D.2d 898 (error of shackling and handcuffing the defendant during trial not harmless where the decision was based solely on Sheriff's recommendation); *Dickson v. State*, 108 Nev. 1, 822 P.2d 1122 (1992) (error of shackling defendant in the presence of jurors was not harmless where the evidence against the defendant was extremely close); *Townsend v. State*, 308 Ark. 266, 824 S.W.2d 821 (1992) (placing defendant in leg restraints throughout trial and for no compelling reason, within full view of jury was reversible error and required new trial for both defendants); *Thomas*, 125 A.D.2d 873 (error of

shackling and handcuffing the defendant during trial was not harmless where no justifiable basis existed on the record); *Gammage v. State*, 630 S.W.2d 309 (Tex. Ct. App. 1982) (decision to handcuff the defendant during the course of murder trial was reversible error); *State v. Bird*, 59 Or. App. 74, 650 P.2d 949 (1982) (trial court's error in requiring the defendant to wear leg restraints through his murder trial was not harmless); *People v. Burnett*, 111 Cal. App. 3d 661, 168 Cal. Rptr. 833 (1980) (trial court's error was reversible where the defendant stood trial wearing leg restraints where the defendant had not manifested any violent or disruptive conduct during the trial, and a seven-year-old conviction for escape did not justify restraints nor did the fact that he had previously been convicted of first degree murder); *Willocks v. State*, 546 S.W.2d 819 (Tenn. Crim. App. 1976) (reversible error to shackle the defendant during trial); *Duran*, 16 Cal. 3d 282 (court reversed conviction where the defendant appeared before the court in restraints, along with other errors on appeal); *Walthall v. State*, 505 S.W.2d 898 (Tex. Crim. App. 1974) (bringing the defendant in during voir dire in full restraints without any indication that the defendant was an escape risk or threat to anyone in the courtroom was reversible error); *State v. Kelly*, 506 S.W.2d 61 (Mo. Ct. App. 1974) (reversible error where the defendant was shackled during one-half day of trial during which the rape victim testified to the brutal details of her assault); *Woodwards v. Cardwell*, 430 F.2d 978 (6th Cir. 1970) (reversible error where the defendant was shackled and handcuffed during trial); *State v. Rice*, 347 Mo. 812, 149 S.W.2d 347 (1941) (reversible error where the defendants appeared in front of the jury handcuffed together).

Other courts have found such an error to be harmless where there was overwhelming evidence of the defendant's guilt. *See State ex rel. Cockerham v. Butler*, 515 So. 2d 1134 (La. Ct. App. 1987) (error harmless where three victims identified the defendant and the jury saw the defendant in handcuffs for only a short period of time); *State v. Johnson*, 489 So. 2d 301 (La. Ct. App. 1986) (error was harmless in

view of the five eyewitnesses and the substantial proof presented against the defendant); *People v. Jacla*, 77 Cal. App. 3d 878, 144 Cal. Rptr. 23 (1978) (error was harmless beyond a reasonable doubt although the defendant was shackled throughout the trial); *Zygadlo v. State*, 341 So. 2d 1053 (Fla. Dist. Ct. App. 1977) (the court stated that although leg shackles were used on the accused during his trial, the record disclosed overwhelming evidence of his guilt); *People v. Prado*, 67 Cal. App. 3d 267, 136 Cal. Rptr. 521 (1977) (error harmless beyond a reasonable doubt based on the compelling evidence against the defendant); *Chandler v. State*, 92 Nev. 299, 550 P.2d 159 (1976) (error harmless where the defendant confessed to the murder not only to an FBI agent but also in a letter written to the victim's wife); *People v. Thompson*, 23 Cal. App. 2d 339, 72 P.2d 927 (1937) (although the defendant was placed in leg irons throughout the trial evidence of guilt was overwhelming and thus reversal was not warranted); *but see Boose*, 66 Ill. 2d at 269 (Supreme Court of Illinois reversed the defendant's conviction, on a guilty plea of murder, where he was erroneously required to be handcuffed and shackled during his competency hearing stating "[h]owever strong the evidence against an accused may be, . . . a fair trial, in all its stages, is a fundamental requirement in a criminal prosecution and when such a requirement is not met, it amounts to a denial of due process of law").

This court has recently held that a claim of unconstitutional shackling is subject to a harmless error analysis. *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998). There, the court concluded error occurred when the defendant was shackled, but because the jury never saw the defendant in shackles and the defendant failed to show he was prejudiced in any way, the error was harmless. *Id.*[15]

■ There is no excuse for the use of physical restraints

---

[15]In *Hutchinson*, 135 Wn.2d at 887-88, we applied a harmless error standard to a shackling error. *Hutchinson*, of course, was not a capital case, and the court there had no occasion to consider whether such an error might be harmless as to the guilt phase of a capital proceeding but not harmless error as to the sentencing phase.

in this case. It was clear error. Nevertheless, even this error may be harmless based on the overwhelming evidence of guilt. There were many eyewitnesses to the crimes committed in this case and the Defendant confessed to killing Ron and the police officer not only to the police but in letters and statements to his friends. Based on the compelling evidence admitted during trial of the Defendant's guilt, we believe that any reasonable jury would have reached the same result in the absence of the trial court's error. *See Guloy*, 104 Wn.2d at 425 ("[a] constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error"). Only because evidence of guilt is overwhelming do we affirm the conviction in this case.

 The determination that error in shackling a defendant is harmless error in the guilt phase of a capital proceeding does not resolve the question whether such error is harmless in the sentencing phase. This is because the purposes of the two phases are distinct. In the guilt phase, the inquiry is whether the defendant is guilty of the crime(s) charged. The conviction of a defendant who has suffered prejudice as a result of unconstitutional shackling may nevertheless be upheld where overwhelming evidence supports the determination of guilt. If there is such evidence, and the reviewing court can therefore conclude that beyond a reasonable doubt any reasonable jury would have convicted the defendant, the reliability of the guilt determination is assured.

At sentencing, however, the inquiry is not the same. Instead of deciding whether the defendant committed the charged offense(s), the jury must decide whether to impose a death sentence on the defendant. Unlike the guilt phase, the prejudice to the Defendant during a special sentencing proceeding cannot necessarily be overcome by objective and overwhelming evidence. " '[T]he fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual

offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)). The evidence considered during the special sentencing proceeding is of a more subjective nature dealing with not only the nature of the crimes involved but also with personal history and the character of the Defendant. *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Pirtle*, 127 Wn.2d at 671.[16]

██ Here, the issue is the possible impact which shackling the Defendant may have had on the sentencing decision, particularly in connection with the question of future dangerousness. It is undisputed that placing the defendant in restraints indicates to the jury that the Defendant is viewed as a "dangerous" and "unmanageable" person, in the opinion of the court, who cannot be controlled, even in the presence of courtroom security. The Eleventh Circuit has emphasized that "a jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision." *Elledge*, 823 F.2d at 1450.

The converse, of course, is that evidence that a defendant does not pose a risk of probable future dangerousness is also relevant. The United States Supreme Court has held that evidence of probable future conduct in prison as a well-behaved, well-adjusted prisoner is relevant mitigating evidence which is appropriately considered by a jury in deciding on a sentence less than death. *Skipper v. South Carolina*, 476 U.S. 1, 4-5, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986). In deciding whether to impose a death sentence,

---

[16]This more individualized and subjective assessment made in the sentencing phase is demonstrated, for example, by the recognition that "mercy is a proper circumstance which a capital case jury may consider." *State v. Gentry*, 125 Wn.2d 570, 648, 888 P.2d 1105 (1995).

the "sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 118 S. Ct. 757, 761, 139 L. Ed. 2d 702 (1998); *see also Pirtle*, 127 Wn.2d at 679 (if the jury is precluded from giving effect to a single mitigating factor, the proceeding is constitutionally flawed). It is irrelevant whether the barrier to the sentencer's consideration of mitigating evidence exists because of a statute, because of the sentencing court, or because of an evidentiary ruling. *Mills v. Maryland*, 486 U.S. 367, 375, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988) (citations omitted).

Thus, future dangerousness or the probable lack of future dangerousness of the defendant is a relevant factor for a jury's consideration in deciding whether to impose a death sentence. "In the penalty phase of a capital trial, the jury knows the defendant is a convicted felon. But the extent to which he continues to be dangerous is a central issue the jury must decide in determining his sentence." *Duckett*, 67 F.3d at 748. This is true even where the alternative to a death sentence is that the defendant would be incarcerated for the rest of his or her life. *Skipper*, 476 U.S. at 5 ("[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings*, such evidence may not be excluded from the sentencer's consideration." (footnote omitted)).

Our state statutes embody this principle. One of the statutory factors the jury may consider when deciding to impose the death penalty is "[w]hether there is a likelihood that the defendant will pose a danger to others in the future." RCW 10.95.070(8).

■ The question here does not involve either governmental or defense evidence as to future dangerousness. However, just as State evidence of future dangerousness or defense evidence of probable lack of future dangerousness may affect the jury's decision whether to impose a death sentence, shackling a defendant during the proceedings might affect the jury's sentencing decision as well. Shack-

ling sends a message to the jury that, in the court's view, the defendant is so dangerous that he or she cannot be allowed to attend the proceedings, even with other security measures, without physical restraints.

It is true that the presumption of innocence does not apply during the sentencing phase of a capital proceeding. However, shackling or otherwise physically restraining the defendant may still implicate a defendant's constitutional rights because of its possible impact on the sentencing decision.

As the court in *Duckett* observed, in cases where shackling has been approved there was evidence of defendant's disruptive courtroom behavior, defendant's escape attempts, assaults or attempted assaults while in custody, or defendant's pattern of defiant behavior toward corrections officials and judicial authorities. *Duckett*, 67 F.3d at 749. The court reasoned that a defendant's status as a convicted felon is not reason alone to impose restraints, and that absent evidence like that listed by the court the state trial court had committed constitutional error in allowing the defendant to appear before the sentencing jury in physical restraints. *Duckett*, 67 F.3d at 749.[17]

Undeniably, the presence of Mr. Finch in physical restraints indicated to the jury that his character is dangerous and prejudiced him in such a manner that warrants a reversal of his death sentence. The Defendant was not presented in restraints for but a brief period of time; in fact, Mr. Finch never appeared before the jury without being physically restrained. To make matters worse, the Defend-

---

[17]In addressing whether such error was harmless under the standard applicable in federal habeas proceedings (whether the shackling had a substantial and injurious effect or influence in determining the jury's verdict), the court concluded it was in grave doubt as to whether there was such an effect and thus could not conclude the error was harmless. *Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995).

The defendant in *Duckett* had not been sentenced to death, but instead to life without parole where there was an option of sentencing to life with parole. Because shackling might have affected that decision, remand for an evidentiary hearing in state court on the issue of prejudice was ordered by the federal court. *Duckett*, 67 F.3d at 749.

ant's leg restraints were handcuffed to the leg of the table and his right arm was handcuffed to his chair during the testimony of two of the victims. In this case, the error with regard to the jury's decision to impose the death penalty was not harmless beyond a reasonable doubt. We reverse the jury's sentence of death and remand for a new special sentencing proceeding.

Motion for a new trial

 The Defendant argues that the trial court erred in denying his motion for a new trial. A trial court's ruling on a motion for a new trial will not be disturbed absent abuse of discretion. *State v. Williams*, 96 Wn.2d 215, 221, 634 P.2d 868 (1981).

 The Defendant argues that he was denied a fair trial because evidence concerning the response of the law enforcement officers created unfair prejudice, Sgt. Kinard's parents sat close to the jury box, and Mr. Finch was handcuffed during the testimony of Margaret and Thelma. There was no indication from the record of unfair prejudice concerning the testimony of the officers in this case and there is no reason the parents of Sgt. Kinard could not sit anywhere they would like. With regard to the handcuffing issue, we determined that a reversal of the guilt phase was not warranted on this basis. Thus, the trial court did not err in denying the motion for a new trial.

The court's prohibition of future contact with jurors

The Defendant challenges the trial court's jury protective order. That order precludes the attorneys and their agents from initiating contact with the jurors, except on prior approval of the court. This restriction applies only to the attorneys in the case and their agents, anyone else may initiate contact with the jurors. Additionally, the jurors themselves may initiate contact with anyone, including the attorneys.

 Courts generally disfavor postverdict interviewing of jurors. *See Haeberle v. Texas Int'l Airlines*, 739 F.2d 1019 (5th Cir. 1984); *United States v. Riley*, 544 F.2d 237

(5th Cir. 1976); *United States v. Garcia*, 732 F.2d 1221 (5th Cir. 1984); *King v. United States*, 576 F.2d 432 (2d Cir. 1978); *United States v. Franks*, 511 F.2d 25 (6th Cir. 1975); *United States v. Driscoll*, 276 F. Supp. 333 (S.D.N.Y. 1967); *Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 191 N.W.2d 418 (1971).

> [Courts] have repeatedly refused to 'denigrate jury trials by afterwards ransacking the jurors in search of some new ground, not previously supported by evidence, for a new trial.' Prohibiting post-verdict interviews protects the jury from an effort to find grounds for post-verdict charges of misconduct, reduces the 'chances and temptations' for tampering with the jury, increases the certainty of . . . trials, and spares the district courts time-consuming and futile proceedings. We have therefore uniformly refused to upset the denial of leave to interview jurors for the purpose of obtaining evidence of improprieties in the deliberations unless specific evidence of misconduct was shown by testimony or affidavit.

*Haeberle*, 739 F.2d at 1021 (citations omitted).

The Defendant claims that he has been deprived of the means to uncover jury misconduct. However, there is no allegation of juror misconduct in the case nor showing of specific instances of juror misconduct. We decline to disturb the trial court's order restricting the attorneys' contact with the jurors after the trial. The order does not infringe upon news gathering, the rights of the attorneys to talk to anyone else besides the jurors, or jury contact by other persons besides the litigants in this case. *See State v. Bassett*, 128 Wn.2d 612, 911 P.2d 385 (1996) (gag order forbidding attorneys in a judicial proceeding from communicating with anyone outside the court is an unconstitutional prior restraint on free speech); *Journal Publ'g Co. v. Mechem*, 801 F.2d 1233, 93 A.L.R. FED. 407 (10th Cir. 1986) (order precluding anyone from talking to jurors after the disposition of the case held unconstitutional); *In re Express-News Corp.*, 695 F.2d 807 (5th Cir. 1982) (distinguishing press interviews from those designed to obtain evidence of improprieties in the deliberations; the former are constitu-

tionally protected and the latter are improper). The order is to protect the jurors privacy interests and we find that it was proper.

Issues relating to sentences for assault and unlawful imprisonment

The Defendant challenges his life sentence for second degree assault pursuant to the Persistent Offender Accountability Act and his 29-month sentence for unlawful imprisonment. The Defendant argues that he cannot be sentenced as a persistent offender unless he is charged with that "crime." This argument, however, was rejected in *State v. Thorne*, 129 Wn.2d 736, 921 P.2d 514 (1996).

The Defendant also argues that the assault and the unlawful imprisonment convictions encompassed the same criminal conduct. Under the "concurrent sentence doctrine," an appellate court has discretion not to consider the validity of multiple convictions when concurrent sentences are imposed. *State v. Schneider*, 36 Wn. App. 237, 240, 673 P.2d 200 (1983). Courts will not speculate as to possible or remote collateral consequences of sentencing. *State v. Bowman*, 36 Wn. App. 798, 807, 678 P.2d 1273 (1984). Thus, we decline to decide these issues.

GUY, C.J., and SMITH and ALEXANDER, JJ., concur.

SANDERS, J. (concurring in part, dissenting in part) — I agree with the majority that Finch was unconstitutionally shackled; however, I cannot agree undermining the presumption of innocence is "harmless error" in the guilt phase of this proceeding. I would reverse, granting a new trial on all counts.

The majority concludes the error was harmless with respect to the guilt phase because the evidence of defendant's guilt was "overwhelming." I disagree with the majority in both theory and application.

In theory, it is the jury, and only the jury, which may determine the guilt of the accused. Unlike a civil case, we

may not test a jury's apparent improvident acquittal against a substantial, or even overwhelming, evidence standard. Indeed the annals of the criminal justice system are replete with jury acquittals returned notwithstanding overwhelming evidence of guilt. Since it is simply not our legal prerogative to reverse an acquittal for lack of evidentiary support, it seems inconsistent to uphold a conviction notwithstanding manifest constitutional error based upon how we, as appellate judges, would weigh evidence offered by witnesses we have neither seen nor heard.[18]

But even assuming, hypothetically, overwhelming evi-

---

[18]*United States v. Hasting*, 461 U.S. 499, 516, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983) (Stevens, J., concurring) ("A federal appellate court should not find harmless error merely because it believes that the other evidence is 'overwhelming' . . . . 'The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.' " (quoting *Kotteakos v. United States*, 328 U.S. 750, 763-64, 66 S. Ct. 1239, 1247, 90 L. Ed. 1557 (1946))).

Nor has the "overwhelming evidence" rule escaped scholarly criticism. For example, such rule provides no incentive for litigants, particularly the state in criminal cases, to avoid error, and a determination of overwhelming evidence "necessarily invades a process which our justice system reserves for the jury." Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 Gonz. L. Rev. 277, 290 (1995-96). *See also* Harry T. Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. Rev. 1167, 1170 (1995) ("The problem with harmless error arises when we as appellate judges conflate the harmlessness inquiry with our own assessment of a defendant's guilt."); Gregory Mitchell, *Against "Overwhelming" Appellate Activism: Constraining Harmless Error Review*, 82 Cal. L. Rev. 1335, 1340 (1994) (The overwhelming evidence test employed by appellate courts "undermines the jury's function as the conscience of the community and intrudes on the Sixth Amendment right to trial by jury." Moreover it is unreliable "because it establishes as factfinders persons in a poor position to examine facts." *Id.* at 1367); David M. Skoglind, *Harmless Constitutional Error: An Analysis of Its Current Application*, 33 Baylor L. Rev. 961, 966 (1981) (The "other evidence" test results in disparate treatment among accused individuals for the same constitutional violation, with less deference paid to the Constitution in the case of "the person whose guilt is more evident."); Tom Stacy & Kim Dayton, *Rethinking Harmless Constitutional Error*, 88 Colum. L. Rev. 79, 134 (1988) (Before an appellate court may conclude that evidence is "overwhelming," it must resolve all evidentiary conflicts in defendant's favor and "take account of the prosecution's burden to prove guilt beyond a reasonable doubt."); Marla L. Mitchell, *The Wizardry of Harmless Error: Brain, Heart, Courage Required When Reviewing Capital Sentences*, 4 Kan. J.L. & Pub. Pol'y 51, 52 (1994) ("But even a court which embraces the harmless error rule as a solution must understand that harmless error is a rare justification for death."); Linda E. Carter, *Harmless Error in the Penalty Phase of a Capital Case: A Doctrine Misunderstood and Misapplied*, 28 Ga. L. Rev. 125, 130 (Fall 1993) ("Harmless error analysis is not appropriate for 'structural' errors that affect the integrity of the entire process.").

dence of guilt is sufficient to render even so fundamental a constitutional error as this merely harmless, I see several debatable links in the chain which binds Finch to the conclusion that he is guilty of a double aggravated murder. Our law is clear that a constitutional error is presumed to be prejudicial and the state bears the burden of proving the error was harmless. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985); *State v. Stephens,* 93 Wn.2d 186, 190-91, 607 P.2d 304 (1980).[19]

With respect to Count I, the premeditated murder of Ron Modlin, I find particularly problematic proof of the alternative aggravators pursuant to court's instruction number nine:

> If you find the defendant guilty of premeditated murder in the first degree as charged in Count I, you must then determine whether any of the following aggravating circumstances exist:
>
> (1) There was more than one person murdered and the murders were part of a common scheme or plan; or
>
> (2) The murder was committed in the course of, in furtherance of, or in immediate flight from burglary in the first degree.

Clerk's Papers (CP) at 616. Rather it is the claim of this defendant that there was insufficient evidence, no evidence in fact, of a "common scheme or plan" so as to even merit presenting this aggravating factor to the jury for its deliberation. The law in this regard is sufficiently set forth by the majority at 835-37, to obviate the necessity of further citations to authority; however, suffice to say, rejecting defendant's insufficiency argument by "[d]rawing all reasonable inferences in favor of the State," Majority at 836, is hardly proof positive of the reciprocal proposition, that there were no reasonable inferences upon which the jury could reject the conclusion that each of the two killings

---

[19]To the extent *State v. Hutchinson,* 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998), *cert. denied,* 525 U.S. 1157 (1999), suggests the burden is on the defendant to show prejudice in the case of unconstitutional shackling, it relies on federal cases and is clearly contrary to our own precedent.

were connected by "a larger criminal purpose." Majority at 836.

Nor is the conclusion that the homicide of Modlin "was committed in the course of, or in furtherance of, or in immediate flight from burglary in the first degree," forgone. Once again the majority analyzes the burglary aggravator in terms of whether there was "sufficient evidence" to present the issue to the jury, Majority at 837, rather than whether there was reasonable basis for an argument to the contrary. In this regard the jury was instructed:

> A person commits the crime of burglary in the first degree when he or she enters or remains unlawfully in a dwelling with intent to commit a crime against a person or property therein, and if, in entering or while in the dwelling or in immediate flight therefrom, that person or an accomplice in the crime is armed with a deadly weapon or assaults any person therein.

CP at 617 (Instruction No. 10).

Finch argued that he did not enter or remain "unlawfully in a dwelling" because he

> was privileged to enter the trailer because Thelma had never acted to exclude him and because she did not refuse him permission to enter on the night of the incident. In fact, by asking him not to bring the beer inside because her mother was present on August 15, 1994, Thelma impliedly invited him to come inside without it.

Br. of Appellant at 141-42.[20] Therefore, argues Finch, his entry into the trailer was not burglary and the aggravator was at least arguably not present.

Were the presumption of Finch's innocence not destroyed by the shackling, I cannot say, beyond a reasonable doubt, that the jury would not have rejected both of these alleged aggravating factors.

The conviction of Finch for the aggravated premeditated

---

[20]Thelma Finch testified, "No; I didn't tell him that he shouldn't come in." Report of Proceedings (RP) at 291 (May 19, 1995).

murder of Officer Kinard (Count II) may also have resulted from destruction of the presumption of innocence to which the accused is constitutionally entitled.

Finch argued that the shot which took Kinard's life was random and reckless rather than premeditated.[21] The circumstances surrounding the killing at least lend some arguable basis for this claim since the distance between Finch and the officer was considerable for a pistol[22] and the view of the officer was arguably obscured.[23] Moreover, the aggravating factor regarding common scheme or plan, as previously discussed, is definitely problematic.

Therefore, in a sense, I agree with the thrust of Justice Talmadge's dissent that it is "illogical" (Talmadge, J., dissenting op. at 877) to conclude that the shackling error was prejudicial when it came to the penalty phase yet harmless in the guilt phase, although, unlike Justice Talmadge, I would consistently find the error prejudicial on both counts, rather than neither.

For these reasons I would reverse the conviction and remand for a new trial, and therefore dissent.

JOHNSON, J., concurs with SANDERS, J.

TALMADGE, J. (dissenting) — I respectfully dissent from the majority opinion on the issue of Finch's restraint by the trial court. The majority essentially negates our decision in *State v. Hutchinson*, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998), *cert. denied*, 525 U.S. 1157 (1999), and ignores the trial court's findings of fact on the restraint questions we specially remanded to the trial court to decide.

Our decisions on in-court restraint of a defendant during

---

[21]The shots were rapid-fire in different directions: ". . . zigzag, just one after another." RP at 322 (May 19, 1995 (Thelma Finch)); "I [Finch] stuck the gun out the window and pulled the trigger." RP at 1037 (May 25, 1995) (Detective Brad Pince testifying as to what Finch told him).

[22]105 feet. RP at 1483-84 (May 30, 1995).

[23]Through "a lot of shrubbery." RP at 455 (May 22, 1995) (Sergeant Arnold Aljets).

trial are clear. The defendant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution is violated if the defendant appears before a jury in shackles or other restraints. Because restraints have implications as to a defendant's dangerousness, an appearance in restraints as we noted in *Hutchinson* may deprive a defendant of the presumption of innocence before a jury.

We have also noted, however, this right is not absolute. A trial court has broad discretion to determine if a defendant's conduct is so dangerous or disruptive as to require restraints in the courtroom. *State v. Breedlove*, 79 Wn. App. 101, 113-14, 900 P.2d 586 (1995). In the seminal case *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981), we enunciated the factors a trial court must consider before a defendant may be restrained in court:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character;[24] his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

By this time, trial courts should be well aware the *Hartzog* factors require an individualized assessment on the record of the necessity for restraint of a defendant in a courtroom proceeding. This is not a decision that can be delegated by the trial court to correctional personnel.

---

[24]The majority opinion disregards this factor. Finch premeditated and in cold blood shot a blind man in the head, and then murdered a deputy sheriff from ambush. He was charged with aggravated first degree murder and the State sought the death penalty. Nevertheless, the majority says at 851, astoundingly, "[T]he crimes charged in this case do not warrant physical restraints." One may well wonder what crimes, in the majority's view, *would* be serious enough to warrant physical restraints. The majority's statement here effectively abrogates the first of the *Hartzog* factors. If indeed the majority wishes to overrule this part of *Hartzog*, it should say so explicitly.

In the present case, there were ample grounds supporting an individualized decision that Charles Finch should be restrained at trial. Neither we nor the trial court should be oblivious to the fact Finch was charged with a double murder. He had a history of convictions for five prior felonies including manslaughter and assault with a dangerous weapon. Moreover, in the process of arresting Finch for these crimes, law enforcement personnel attempted to subdue him with tear gas. Despite the tear gas, three deputy sheriffs were required to subdue him. The trial court noted, "And the Court was aware of two of those officers as being very strong, very large deputy sheriffs." Report of Proceedings (Remand) at 1. Finch is a large man who made threats to his wife in the course of the alleged crime. He took his ex-wife and her elderly mother as hostages. Armed, Finch kept law enforcement personnel at bay by shooting indiscriminately in their direction. Finch, while incarcerated, attempted suicide. The proposed jury room for trial was relatively small, giving Finch ready access to some of the witnesses, including his ex-wife against whom he had expressed violent feelings. All of these individualized factors supported the use of restraints under the *Hartzog* factors.

The trial court here erred, however, because it did not undertake the individualized assessment of Finch's situation *Hartzog* requires. Contemporaneous consideration on the record of the *Hartzog* factors for the particular defendant is required to avoid error and a deprivation of the defendant's constitutional rights to appear before the jury unrestrained.

## A. HARMLESS ERROR

The key consideration in this case, and why I depart from the majority's analysis, is the majority's failure to apply harmless error analysis. In *Hutchinson*, we made it clear a harmless error analysis applies to the question of restraint:

> A claim of unconstitutional shackling is subject to harmless

error analysis. In order to succeed on his claim, the Defendant must show the shackling had a substantial or injurious effect or influence on the jury's verdict. Because the jury never saw the Defendant in shackles, he cannot show prejudice. *Rhoden v. Rowland*, 10 F.3d 1457, 1459-60 (9th Cir. 1993). The Defendant does not argue persuasively that he was prejudiced in any way by the unseen restraints. Accordingly, we hold any error was harmless. *See United States v. Collins*, 109 F.3d 1413, 1418 (9th Cir.), *cert. denied*, 522 U.S. 870 (1997).

*Hutchinson*, 135 Wn.2d at 888. The majority simply ignores *Hutchinson* by failing to do a harmless error analysis of the restraints on Finch during the sentencing phase. All the majority does is conclusorily decide any restraints constitute prejudice and are never harmless error: "Undeniably, the presence of Mr. Finch in physical restraints indicated to the jury that his character is dangerous and prejudiced him in such a manner that warrants a reversal of his death sentence." Majority op. at 865. I disagree.

After finding Finch guilty of aggravated first degree murder, the jury had to decide whether to sentence Finch to death or life in prison without the possibility of release or parole. These were the only two sentences allowed under RCW 10.95.030.[25] The majority decides the presence of restraints impermissibly induced the jury to choose the death penalty because the restraints indicated to the jury Finch was too dangerous to be turned loose on the prison population.

This conclusion requires a substantial suspension of

---

[25]The Legislature enacted very strong language to ensure one convicted of aggravated first degree murder shall never leave prison. RCW 10.95.030(1) provides:

Except as provided in subsection (2) of this section, any person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole. A person sentenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer and the indeterminate sentence review board or its successor may not parole such prisoner nor reduce the period of confinement in any manner whatsoever including but not limited to any sort of good-time calculation. The department of social and health services or its successor or any executive official may not permit such prisoner to participate in any sort of release or furlough program.

disbelief. It requires one to assume that uppermost in the jurors' minds when they were considering whether to sentence Finch either to death or life imprisonment without the possibility of parole was his future dangerousness to the prison population to which he would be exposed for the rest of his life.[26] I do not believe it plausible that solicitude for the safety of imprisoned criminals persuaded the jury to impose the death sentence on Finch.[27]

Equally implausible is the majority's notion that but for the appearance of restraints on Finch, the jury would not have voted for the death penalty. Having found him guilty of aggravated first degree murder, the jury knew the following information about Finch: He admitted he had been planning to kill Modlin, a blind man who was essentially defenseless, for three months. 1 Trial Report of Proceedings at 64. He ambushed and killed a police officer for no reason other than "I don't like the lousy cops." 1 Trial Report of Proceedings at 92. He was without remorse, as exemplified by his statement in a letter: "I'm just sorry that I didn't finish the job I started." 11 Trial Report of Proceedings at 1984. He had committed violent crimes in the past, including manslaughter, first degree rape, and assault with a dangerous weapon, as well as two burglaries. 14 Trial Report of Proceedings at 2466. In spite of all that, the majority holds it was only the appearance of Finch in restraints that impermissibly planted the seed in the jurors' heads that Finch might be a dangerous man, causing the jury to choose the sentence of death, rather than life in prison.

The majority's refusal to consider harmless error is

[26]Notably, Finch himself did not argue to the jury he posed no danger to the prison population. Finch may well have concluded such an argument coming from a double murderer is so absurd it would have angered the jury.

[27]Although we held in State v. Gentry, 125 Wn.2d 570, 641, 888 P.2d 1105, cert. denied, 516 U.S. 843, 116 S. Ct. 131, 133 L. Ed. 2d 79 (1995), as an evidentiary matter, "it was not unreasonable for the prosecuting attorney to argue that the Defendant is a dangerous person who would continue to present a danger even while incarcerated[,]" I deem it highly unlikely that such considerations would sway a sentencing jury one way or the other after it had already found a defendant guilty of aggravated first degree murder.

inexplicable. After engaging in a harmless error analysis to uphold the guilty verdict in the guilt phase, despite the jurors' knowledge of the restraints on Finch, the majority rejects a similar harmless error analysis for the penalty phase verdict, giving as a reason for doing so only that "[t]he evidence considered during the special sentencing proceeding is of a more subjective nature dealing with not only the nature of the crimes involved but also with personal history and the character of the Defendant." Majority op. at 863. The majority's approach is illogical. If Finch's restraint during the guilt phase, when the jury had yet to decide Finch was actually guilty, was harmless error, how can the presence of restraints during the sentencing phase not also be harmless?

Moreover, while it is true that consideration of mitigating factors during the capital sentencing phase calls for a "reasoned moral response," *In re Personal Restraint of Rupe*, 115 Wn.2d 379, 387, 798 P.2d 780 (1990) (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring)), the majority offers no clue as to why this makes a difference in concluding we should not even do a harmless error analysis. The mere presence of some subjectivity in the sentencing decision does not logically compel the majority's tendentious conclusion.[28] Indeed, if we do the analysis, we may

---

[28]That some element of subjectivity enters into a jury's deliberations during the penalty phase is inevitable. Nevertheless, the United States Supreme Court has admonished the states to observe strict procedures to avoid caprice in sentencing. As we said in *State v. Dodd*, 120 Wn.2d 1, 13-14 n.2, 838 P.2d 86 (1992):

> The Eighth Amendment, which prohibits "cruel and unusual punishments", applies to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962). Infliction of the death penalty especially invokes the concerns of the Eighth Amendment because the penalty is irrevocable. *Furman v. Georgia*, 408 U.S. 238, 306, 33 L. Ed. 2d 346, 388, 92 S. Ct. 2726, 2760 (1972). The Supreme Court, therefore, imposes procedural and substantive restrictions on legislatures and sentencing authorities, to ensure that "capital punishment is not imposed without . . . serious and calm reflection . . . ." *Thompson v. Oklahoma*, 487 U.S. 815, 856, 101 L. Ed. 2d 702, 733, 108 S. Ct. 2687, 2710 (1988). The sentencing scheme must not allow the death penalty to be wantonly or freakishly imposed, it must direct and limit jury discretion, to minimize the risk of arbitrary or

conclude the error was not harmless, but we should at least do the analysis.

The majority's refusal to apply a harmless error analysis here is contrary to a huge body of law allowing it. The United States Supreme Court "has recognized that most constitutional errors can be harmless." *Arizona v. Fulminante,* 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). The rule is as follows:

> [I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.

*Rose v. Clark,* 478 U.S. 570, 579, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986).[29]

In Washington constitutional errors are generally deemed prejudicial, *State v. Caldwell,* 94 Wn.2d 614, 618, 618 P.2d 508 (1980), and the State bears the burden of proving harmless error beyond a reasonable doubt. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied,* 475

capricious action, and it must allow particularized consideration of relevant aspects of the character and record of each defendant, and the circumstances of the offense, before imposition of the sentence. *Gregg v. Georgia,* 428 U.S. 153, 188-89, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932, *reh'g denied,* 429 U.S. 875, 50 L. Ed. 2d 158, 97 S. Ct. 197, 198 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 304-05, 49 L. Ed. 2d 944, 960-61, 96 S. Ct. 2978, 2991 (1976).

[29]*Accord United States v. Smith,* 987 F.2d 888, 892 (2d Cir.), *cert. denied,* 510 U.S. 875, 114 S. Ct. 209, 126 L. Ed. 2d 165 (1993); *United States v. Casoni,* 950 F.2d 893, 917 (3d Cir. 1991); *United States v. Mackey,* 114 F.3d 470, 473 (4th Cir. 1997); *White v. Johnson,* 153 F.3d 197, 202 (5th Cir. 1998); *United States ex rel. Thomas v. O'Leary,* 856 F.2d 1011, 1017 (7th Cir. 1988); *United States v. Raether,* 82 F.3d 192, 194 (8th Cir. 1996); *Rice v. Wood,* 77 F.3d 1138, 1141 (9th Cir.), *cert. denied,* 519 U.S. 873, 117 S. Ct. 191, 136 L. Ed. 2d 129 (1996); *United States v. DeSoto,* 950 F.2d 626, 630 (10th Cir. 1991); *Luu v. People,* 841 P.2d 271, 273 (Colo. 1992); *State v. Gerardi,* 237 Conn. 348, 677 A.2d 937, 944 (1996); *Ex parte Fierro,* 934 S.W.2d 370, 372 (Tex. Crim. App. 1996), *cert. denied,* 521 U.S. 1122, 117 S. Ct. 2517, 138 L. Ed. 2d 1019 (1997).

U.S. 1020, 106 S. Ct. 1208, 89 L. Ed. 2d 321 (1986). Most directly on point, however, is *Hutchinson*, where we said, "A claim of unconstitutional shackling is subject to harmless error analysis. In order to succeed on his claim, the Defendant must show the shackling had a substantial or injurious effect or influence on the jury's verdict." *Hutchinson*, 135 Wn.2d at 888. Despite *Hutchinson*, the majority simply concludes restraints always have a "substantial or injurious effect," irredeemably prejudicing the jurors, hardening their hearts and implacably impelling them to the death penalty verdict.

Also missing from the majority opinion is a discussion of constitutional law. Where was the constitutional error here? Finch had no presumption of innocence at the sentencing hearing. The majority identifies no constitutional infirmity and does not say what constitutional right Finch was denied.

Because the majority does not permit a harmless error analysis, it establishes the principle that no matter how heinous a crime, no matter how certain the guilt, in all circumstances, without exception, if during the sentencing phase of a trial the jury learns the defendant is being physically restrained, the defendant is deprived of some right, the verdict is irretrievably tainted, and a retrial of the sentencing phase must occur. While such a conclusion may obtain, absent harmless error, for the *guilt* phase of a trial,[30] during which the accused is presumed innocent until the verdict of guilty is actually pronounced, it is totally incomprehensible for the *penalty* phase, where the presumption of innocence no longer exists for the now-convicted murderer awaiting sentencing. *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1089 (1993) ("[P]resumption of innocence which accompanies the accused throughout the proceedings to determine his guilt

---

[30]The majority cites pages of authority for this uncontroversial point, but that authority is applicable only to the guilt phase of the trial, and does not bear on the sentencing procedures at issue here.

880

has no direct application to the sentencing determination.").[31] As the Utah Supreme Court said:

This presumption [of innocence] no longer applies during the penalty phase of a capital trial. Indeed, a jury sitting at a penalty phase recently found the defendant guilty of first degree murder during the guilt phase of the trial. As a result, the constitutional foundation for the right to be free from shackles or other restraint no longer exists, and we accord greater significance to public safety concerns. Where the defendant has already lost the presumption of innocence, it is within the sound discretion of the trial court to determine the safety measures necessary to insure the security of the courtroom and its occupants. These safety measures may include shackling a defendant in appropriate circumstances.

*State v. Young*, 853 P.2d 327, 350 (Utah 1993) (footnotes omitted).

The majority cites only one case *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987), *cert. denied*, 485 U.S. 1014, 108 S. Ct. 1487, 99 L. Ed. 2d 715 (1988), to support its proposition that the presence of physical restraints during the sentencing phase of a capital murder trial always requires a retrial, and that harmless error analysis does not apply. *Elledge* is in fact the *only* case that so holds. All other courts to have considered the presence of physical restraints on convicted murderers during sentencing proceedings disagree with *Elledge*.[32]

First among those decisions was the Florida Supreme Court's decision in *Elledge v. State*, 408 So. 2d 1021 (1981), *cert. denied*, 459 U.S. 981, 103 S. Ct. 316, 74 L. Ed. 2d 293

---

[31]*Accord McNew v. State*, 271 Ind. 214, 391 N.E.2d 607, 612 (1979); *Bowers v. State*, 306 Md. 120, 507 A.2d 1072, 1078, *cert. denied*, 479 U.S. 890, 107 S. Ct. 292, 93 L. Ed. 2d 265 (1986); *Matter of Wayne M.*, 121 Misc. 2d 346, 467 N.Y.S.2d 798, 801 (N.Y. Fam. Ct. 1983); *Duckett v. State*, 104 Nev. 6, 752 P.2d 752, 755 (1988); *State v. Wiles*, 59 Ohio St. 3d 71, 571 N.E.2d 97, 119 (1991), *cert. denied*, 506 U.S. 832, 113 S. Ct. 99, 121 L. Ed. 2d 59 (1992).

[32]The majority does not state *Elledge* is a minority rule and fails to discuss or at least cite to other cases with contrary views.

(1982).[33] There, the trial judge ordered the convicted defendant to wear leg irons during the death penalty hearing after learning the defendant had stated his intention to attack the bailiff, and was proficient in karate. The Florida Supreme Court, after noting the presumption of innocence attaches to an accused person, said:

> But appellant did not stand before the sentencing jury as an innocent man; rather he stood as a confessed murderer of three persons. The critical issue in a restraint case is the degree of prejudice caused by the restraints. Here, we can find very little prejudice since the appellant was an avowed dangerous individual.

*Id.* at 1022-23. Likewise, Finch was a convicted double murderer, a "dangerous individual" by any measure, at his sentencing hearing. It is difficult to understand how his jurors could have been first inclined to sentence him to life in prison but then changed their minds and unanimously sentenced him to death upon discovering he was wearing Velcro ankle restraints. But the majority, following its one, lonely case, *Elledge,* does not permit considerations of prejudice, despite the *Hutchinson* holding to the contrary.

In *Bowers v. State,* 306 Md. 120, 507 A.2d 1072, *cert. denied,* 479 U.S. 890, 107 S. Ct. 292, 93 L. Ed. 2d 265 (1986), Maryland's highest court held the trial court had not abused its discretion by ordering a convicted murderer to wear leg irons during his death penalty sentencing hearing. Similarly to the Florida Supreme Court in *Elledge,* the *Bowers* court said:

> In this case there is no presumption of innocence because Bowers was convicted at the earlier trial and we affirmed on appeal. He stands in the position of a convicted felon brought before a trial court for sentencing. He thus is unlike the ordinary defendant who at trial stands clothed with a presumption of innocence.

---

[33]The Court of Appeals for the Eleventh Circuit in *Elledge,* the case the majority relies on, ordered a retrial upon Elledge's writ of habeas corpus after the state court verdict.

*Id.* at 1078. After a lengthy, scholarly review of the history of restraining accuseds at trial, the court concluded Bowers was not prejudiced by the restraints, and the trial court had not abused its discretion in ordering it. *Id.* at 1081.

A subsequent Maryland case reaffirmed the reasoning of the *Bowers* decision. In *Hunt v. State*, 321 Md. 387, 583 A.2d 218 (1990), *cert. denied*, 502 U.S. 835, 112 S. Ct. 117, 116 L. Ed. 2d 86 (1991), upholding the trial court's restraint of a convicted murderer during the death penalty sentencing hearing, the court observed:

> Shackling a defendant during the guilt/innocence phase of trial is inherently prejudicial because it highlights the "need to separate a defendant from the community at large. . . ." *Holbrook v. Flynn*, 475 U.S. at 569, 106 S. Ct. at 1346, 89 L. Ed. 2d at 534. This concern is not as great during the sentencing hearing. It is clear that the defendant will be separated from the community. The only issue is whether the defendant will receive the death penalty or life imprisonment. The defendant's guilt of first degree murder is established and the jury is less likely to be prejudiced by the defendant's appearance in leg irons.

*Id.* at 228. Once again, a court, unlike *Elledge* and the majority, has taken into account prejudice to the convicted murderer in its determination of the propriety of physical restraints during a death penalty sentencing hearing.

Two state courts have specifically addressed the holding of *Elledge* and rejected it. The Nevada Supreme Court in *Duckett v. State*, 104 Nev. 6, 752 P.2d 752 (1988), held a trial court did not commit reversible error by refusing Duckett's request to be free of manacles and prison garb during the sentencing phase of his trial. As had other courts, *Duckett* noted a convicted murderer's constitutional right to appear in court in street clothes does not exist at a postconviction sentencing hearing. *Id.* at 755. In *State v. Young*, 853 P.2d 327, 350 n.95 (Utah 1993), the Utah Supreme Court noted, "A jury may expect that a person it

has just found guilty of murder will be restrained in some fashion."[34] The court went on to note:

> Further, defendant has shown no prejudice resulting from the shackling. Aside from showing that some jurors briefly viewed the shackles, defendant has offered no evidence of the effect of the shackles upon the jurors or of the likelihood that the shackles had a bearing on the verdict. A defendant is not necessarily prejudiced when jurors briefly view him wearing shackles.[35] The trial court took steps to minimize the effects of the shackles by placing them underneath defendant's coat and by having those present remain seated while the court and the jurors entered the room. Therefore, the effect of the shackles did not likely prejudice defendant.

*Id.* at 351 (footnote omitted). Again, a court took possible prejudice into account.

In *Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995), *cert. denied*, 517 U.S. 1158, 116 S. Ct. 1549, 134 L. Ed. 2d 651 (1996), the Court of Appeals for the Ninth Circuit considered Duckett's habeas corpus petition and addressed the restraint question. The court largely adopted *Elledge*, with one important exception: it asked if Duckett had been prejudiced by shackling, and adopted a harmless error analysis for the determination. *Id.* at 749 (remanding for evidentiary hearing on the issue of prejudice).[36]

In summary, the majority ignores our recently reaffirmed

---

[34]Indeed, Finch's jury may have devoutly wished for Finch to be restrained during the sentencing hearing, given Finch's history of murderous violence. As *Duckett* observed, "Conceivably, after being convicted of two heinous crimes for which the death penalty could have been imposed, Duckett might have concluded that he had nothing to lose from further acts of violence." *Duckett v. State*, 752 P.2d at 755.

[35]The Court of Appeals for the Eleventh Circuit agrees with this statement. *See Gates v. Zant*, 863 F.2d 1492, 1501 (11th Cir.) ("defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs."), *cert. denied*, 493 U.S. 945, 110 S. Ct. 353, 107 L. Ed. 2d 340 (1989).

[36]There are a prodigious number of cases considering the possibility of prejudice stemming from the restraint of defendants. *See, e.g., United States v. Mayes*, 158 F.3d 1215, 1226 (11th Cir. 1998) (defendant failed to show prejudice because jury did not see restraints); *Johnson v. State*, 704 N.E.2d 159, 162 (Ind. App. 1999) ("The fact that a defendant has been seen by jurors while being transported in handcuffs is not a basis for reversal, absent a showing of actual harm.").

rule in *Hutchinson* and adopts a singular minority case as authority for its conclusion we should not review the restraint of Finch during the sentencing phase of his trial for harmless error. In so doing, it elevates form over substance. In the words of the United States Supreme Court, the harmless error rule " 'promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' " *Rose*, 478 U.S. at 577 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). There was no unfairness to Finch. The majority's approach here will not promote public respect for the criminal process.

### B. REFERENCE HEARING

Turning to the question of whether there was any error at all in this case, we ordered the unusual procedure of a reference hearing in a direct appeal. Specifically, we directed two questions to the trial court:

> (1) Was it possible for the jury to see that the Defendant was restrained when entering, leaving or sitting in the hearing room?
>
> (2) If the restraints were not visible, was it possible for the jury to know that the Defendant was restrained in some way based on the restriction of the Defendant's movements?

Washington State Supreme Court Order, Feb. 20, 1998. The trial court conducted an April 9, 1998 hearing on this question and answered both questions directed by us in the negative:

> 1. At the hearing on April 27, 1995, it was not possible for the jurors to see that the Defendant [sic] was restrained when he was entering, leaving, or sitting in the hearing room.
>
> 2. At that hearing, the defendant's movements were not restricted in any way that would make it possible for the jurors to know that the defendant was restrained. It is possible that some of the jurors may have speculated that he was restrained, but it is not possible that any of them knew.

Rather than relying on the trial court's enunciated find-

ings of fact, the majority chooses instead to parse out sentences in the trial court's *oral* ruling in order to discredit the trial court's findings. Even though the trial court found "it is not possible that any of [the jury] knew" Finch was in Velcro leg restraints, the majority "finds" just the opposite: "it was clearly possible that the jury could have known that the Defendant was restrained." Majority op. at 857. And based on the mere *possibility* the jury knew of the restraints, as opposed to the jury's *actual knowledge* of the restraints, the majority decides to remand this case for a retrial of the sentencing phase.

Frankly, I find this appellate court fact-finding offensive to the trial judge. We asked the trial court to hold a hearing and make findings of fact in answer to two specific questions. This was done. Now the majority decides the trial court did not know what it was talking about because of what the majority decides are inconsistent statements in the oral ruling. Nobody on this court knows what the Ginni Stevens Hearing Room in the Snohomish County Courthouse looked like or even how it was arranged for the Finch proceedings. The trial court judge in this case does. Nevertheless, the majority decides not to believe him. A decent respect for the work of our trial court judges should preclude such tendentious second-guessing of their findings of fact where those findings are supported by substantial evidence.

Plainly, the trial court, with the benefit of the witnesses, demonstrations, and its own consideration of the factual circumstances of this case including actual, personal knowledge of the layout of the courtroom, determined the jury would not have seen Finch's restraints before defense counsel specifically requested the trial court remove any skirting around the counsel table so the jury could see the restraints on the defendant. Until that time, the restraints were not visible to the jury. The majority presumes to substitute its understanding of the facts for the trial court's, even though the trial court was obviously in a better position to see and understand the circumstances of the

physical layout of the courtroom. What substantial evidence supporting its own findings of fact does the majority rely upon?

Given the majority's analysis of the harmless error question, some might believe the majority had already determined any form of restraint of a criminal defendant during trial is per se prejudicial error in Washington. If so, then the special reference hearing we ordered the trial court to conduct was meaningless window dressing and a waste of everybody's time.

The general rule trial courts should follow is that physical restraints of defendants are the exception and not the rule. If there are clear security concerns regarding a defendant's presence in the courtroom, the trial court must undertake the individualized assessment of the circumstances required by *Hartzog* and undertake such an analysis on the record before ordering any kind of physical restraint of the defendant in the courtroom.

At the same time, courts cannot be oblivious to the realities of courtroom security. I am not so confident as the majority Finch was no threat simply because he had not *recently* expressed any violent tendencies or been a security problem. We should not announce a rule that requires trial court judges to wait until a defendant on trial commits a violent act in the courtroom before physical restraints may be considered. Rather, we should leave such evaluations to the discretion of the trial court judge, who, after all, is ultimately responsible for the safety of jurors, court personnel, and spectators, and review such evaluations only for abuse of discretion. It is easy to decide in our Olympian detachment, long after the fact and far from the courtroom, that an accused murderer posed no threat to anyone; it is not so easy to make such decisions when one is personally responsible—right now, on the spot—for preventing harm to others.

When the majority can believe a large man who has previously committed violent acts, including manslaughter, first degree rape, and assault with a deadly weapon, who

was on trial for aggravated first degree murder after killing two people including a blind man and a police officer, who took hostages in the course of the crimes, who had threatened a key witness in the case, who had attempted suicide, and who, despite a discharged tear gas canister in a trailer, required three armed deputies to subdue him is not a person about whom the trial court judge could have security concerns, I express little wonder the public finds the judiciary so often out of touch with reality. I would affirm the judgment on the verdict of the jury, both as to Finch's culpability and as to his sentence.

DURHAM, J., and DOLLIVER, J. Pro Tem., concur with TALMADGE, J.